**STATE of Tennessee**

v.

**Janet V. DYCH.**

Court of Criminal Appeals of Tennessee, at Knoxville.

April 25, 2006 Session.

Oct. 27, 2006.

Application for Permission to Appeal Denied by Supreme Court Feb. 26, 2007.

Charles I. Poole, Sevierville, Tennessee, for the appellant, Janet V. Dych.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JON KERRY BLACKWOOD, JJ., joined.

The appellant, Janet V. Dych, was convicted by a jury of one count of first degree murder and one count of facilitation of first degree murder. After waiving her right to jury sentencing, the trial court sentenced the appellant to life without parole for first degree murder and twenty-five years for facilitation of first degree murder, to be served concurrently. After the denial of a motion for new trial, this appeal followed. On appeal, the appellant presents the following issues for our review: (1) whether the appellant when she was not taking her medication was mentally competent to waive her constitutional rights to give a statement to the police regarding her involvement in the death of the victims; (2) whether the evidence was sufficient to support the appellant's conviction for facilitation of first degree murder; and (3) whether the State's written withdrawal of its intent to seek the death penalty operated as a withdrawal of the State's intent to seek a sentence of life without parole so as to require that the trial court's imposition of a sentence of life without parole be vacated. For the following reasons, we affirm the appellant's convictions. However, due to the State's failure to file a written notice of its intention to seek a sentence of life without the possibility of parole after its withdrawal of its intention to seek a death sentence, we modify the appellant's sentence to life with the possibility of parole after service of 51 years of incarceration.

### Factual Background

On Sunday, September 3, 2000, at approximately 3:00 a.m., the Pigeon Forge Police Department and Pigeon Forge Fire Department responded to the scene of a trailer fire at 2565 Ridge Road. Outside the trailer, officers discovered Melissa Collier, who had been stabbed, shot and beaten. Ms. Collier was transported to Fort Sanders/Sevier Medical Center Emergency Room where she was pronounced dead. Firefighters later discovered the body of Leann Abbott inside a bedroom at the back of the trailer. A spent projectile was found underneath the head of Leanne Abbott and two more projectiles were found underneath her body.

The appellant, the appellant's husband Garry Johnson, and the appellant's mother Catherine Dych, all lived next door to the trailer in what was referred to as the green house. The investigation focused on the appellant and her husband. The appellant was transported to the Pigeon Forge Police Department and was later taken back to the green house, where she gave consent for the police to search the residence. During the search, several trash bags were discovered in the kitchen that contained bloody clothing, two small bloody knives and two guns. The appellant was then transported back to the Police Department.

At the Police Department, the appellant exhibited "seizure-like" symptoms, so the Sevier County Ambulance Service was called to the scene. The appellant was observed but refused transport to the emergency room, instead asking for her medications.

Later that day, the appellant was read her *Miranda* Rights. The appellant informed Detective Rene Kendall that she wanted an attorney. Detective Kendall ceased questioning of the appellant, but failed to notify any of the other officers that the appellant had requested an attorney. Soon thereafter, Detective Tim Trentham questioned the appellant extensively about her involvement in the deaths

of Melissa Collier and Leann Abbott. As a result of the questioning, Detective Trentham prepared a written statement that was signed by the appellant.

The next day, the appellant asked to speak with Detective Kenny Bean. The appellant signed a waiver of rights form. After several hours, a written statement was produced that was signed by the appellant, in which she detailed her involvement in the deaths of the victims.

The appellant was indicted by the Sevier County Grand Jury for two counts of first degree murder in October of 2002. In March of 2003, the appellant filed a motion to suppress all statements given by the appellant to the authorities. In the motion, the appellant argued that she exercised her constitutional right to an attorney but was extensively questioned by police and continually denied the right to an attorney despite her exercise of that right. Further, the appellant argued that she was denied prescription medication during her custodial interrogation and as a result her statements were involuntary.

The trial court held a hearing on the motion to suppress on March 22, 2004.[1] At the hearing on the motion to suppress, the trial court heard testimony from several witnesses.

Officer Helen Wright testified that she picked the appellant up at her home at around 5:30 a.m. to take her to the police department. Officer Wright stayed with the appellant for approximately an hour until her shift ended. When Officer Wright's next shift began at around 10:00 p.m. that evening, Officer Wright was again assigned to watch the appellant in the booking room of the police department. There was a cot and blanket set up for the appellant to sleep on.

Officer Wright testified that the appellant was provided pizza, cigarettes and socks and was able to make and receive telephone calls. During Officer Wright's shift, she overheard telephone conversations between the appellant and both her mother and father about the events that occurred. Officer Wright described the appellant as upset at the time, but described her mental faculties as intact.

Officer Wright kept a detailed log while she was assigned to watch the appellant. On September 4, 2000, the appellant slept from approximately 2:25 a.m. until 6:14 a.m., the time that Officer Wright was relieved by Officer Jessie Miracle.

Officer Jessie Miracle testified that he was assigned to watch over the appellant at approximately 6:14 a.m. on September 4, 2000. When Officer Miracle arrived for his shift, the appellant was sleeping. According to Officer Miracle, the appellant continued to sleep until 11:45 a.m. At that time, the appellant awoke and used the restroom. The appellant then asked to speak with Detective Kenny Bean. Officer Miracle described the appellant's demeanor as normal.

Detective Tim Trentham testified that he first came into contact with the appellant on September 3, 2000, in the booking room of the police department. The appellant was with Officer Jessica Lewis–Wear[2] at the time. Detective Trentham stated that he knew the appellant's family.

---

1. It appears from the transcript of that hearing that the trial court "had a previous hearing on this matter ... some months ago." The transcript of the previous hearing is not part of the record on appeal, though the trial court stated that it "recall[ed] the testimony that [wa]s already in the record."

2. Since the incident, Officer Lewis got married and is now Officer Wear. In order to maintain clarity, we will refer to her as Officer Lewis–Wear throughout the opinion.

He spoke with the appellant again around 4:40 p.m. Detective Trentham described the conversation as casual. As the conversation progressed, the appellant told Detective Trentham that Detective Rene Kendall was rude to her. Detective Trentham assured the appellant that all of the officers were trying to do their jobs and find out what happened at the crime scene. The appellant apparently told Detective Trentham that she wanted to tell him what she knew about the incident. The appellant gave Detective Trentham information about the death of the victims that did not incriminate her in any way. At that time, Detective Trentham was not aware that the appellant had exercised her right to an attorney.

Not long thereafter, Detective Trentham received a note from Officer Lewis–Wear stating that the appellant wanted to confess. Detective Trentham walked back into the booking room where the appellant was being kept and told the appellant that her brother Lee was the main suspect. Detective Trentham testified that he told the appellant that he did not want a confession unless it was the truth. The appellant informed Detective Trentham that she did not commit the crime, but that she knew who committed the crime. Detective Trentham reduced the appellant's statements to writing. When Detective Trentham talked with the appellant, he understood that she was a witness rather than a participant in the crime. Detective Trentham described the appellant as clear-headed. During Detective Trentham's discussions with the appellant, he was under the impression that the appellant was in complete control of her mental faculties.

Dr. Charles Rodwell of the Knoxville Psychiatric Group, testified that he started seeing the appellant as a patient after her discharge in February of 2000 from Pennisula Hospital. According to Dr. Rodwell, the appellant was hospitalized in February of 2000 for a suicide attempt. Upon discharge from the hospital, the appellant was prescribed medications indicated for seizure activity. Dr. Rodwell initially diagnosed the appellant with major depression, recurrent with psychotic features. Dr. Rodwell did not diagnose any seizure activity. The appellant informed Dr. Rodwell that she heard voices and was having hallucinations. Dr. Rodwell prescribed Klonopin, Neurontin, Remeron, and Seroquel for the appellant. However, Dr. Rodwell was not aware that the appellant was also receiving hydrocodone and various other medications from another doctor. Dr. Rodwell testified that by March 30, 2000, the appellant denied any auditory or visual hallucinations. Dr. Rodwell continued the appellant's prescriptions for Remeron, Neurontin and Klonopin and set a follow-up visit for two months. The appellant was forced to cancel her May visit due to a traffic accident. Dr. Rodwell spoke with her on the telephone at the time, and the appellant denied any auditory or visual hallucinations as well as suicidal or homicidal thoughts.

Dr. Rodwell saw the appellant again on August 1, 2000. At that time, the appellant still denied any hallucinations, but complained of anxiety and panic attacks. According to Dr. Rodwell, the appellant presented as depressed. Dr. Rodwell added Celexa to the appellant's prescriptions and decreased the dosage of her Neurontin. A follow-up appointment was scheduled for August 31, 2000.

Dr. Rodwell testified that on August 31, 2000, the appellant reported that she discontinued the Celexa due to diarrhea. According to the appellant she felt anxious and had "racing thoughts" with periods of insomnia. Dr. Rodwell discontinued the Celexa and increased the Klonopin dosage.

Dr. Rodwell scheduled a follow-up visit for November of 2000.

Dr. Edward Workman, a neuropsychologist, testified that he reviewed the appellant's medical records. In his professional opinion, the appellant was having epileptic activity on September 3, 2000, when the ambulance was called to the police station, and remained in a postictal state for 24 to 36 hours after 3:00 or 4:00 p.m. on that date. Dr. Workman stated that a person in a postictal state would be precluded from consolidating their memories enough to make a confession.

Willie Bernet, Director of the Division of Forensic Psychiatry at Vanderbilt University School of Medicine, testified on behalf of the State. After a review of the appellant's medical records, the appellant's statements to the authorities, and jail records, as well as the records and materials from Dr. Rodwell and Dr. Workman, Dr. Bernet opined that the appellant suffered from an anxiety attack that resulted in hyperventilation on the day that she was being questioned by authorities. However, Dr. Bernet concluded that the appellant was competent to waive her *Miranda* rights.

Detective Kenny Bean testified that he questioned the appellant in the booking room about the incident after he advised her of her rights. The appellant waived those rights after indicating that she understood each right. The appellant then gave a statement/confession as to her involvement in the murders. Detective Bean did not see anything in the appellant's behavior that led him to believe she was having mental difficulties. Detective Bean was aware that the appellant's mother brought her medications to the police department on September 5, 2000. However, Detective Bean notified the appellant's mother at that time that they could not accept the medications and were unable to administer the medications to the appellant because they were not set up to perform that type of task at the police department. Further, Detective Bean stated that they had no way of verifying if the medications in the pill bottles were what they were purported to be.

At the conclusion of the testimony, the trial court made the following findings of fact and conclusions of law:

The first issue that the court has been asked to address, and which is obviously very appropriate, is whether or not the officers had probable cause to detain the Defendant in this case on September 3rd. And while it came together over a period of hours on September 3rd, it is clear that the statements—first of all, the observation of evidence by Detective Kendall and the subsequent finding of bloody clothes in a trash can or a trash bag in the home of the Defendant, female clothes, combined with the statements of the Defendant's husband, Garry Johnson, that she committed the murder, certainly, I think, gave the officers probable cause to arrest her.

Although it hasn't been relied upon in this case, to be candid, the fact that the Defendant had marijuana in her hands likewise would have been probable cause for an arrest in this case. Even though the officers nor the State is relying upon it as I have heard it here, certainly there were any number of reasons that they could have arrested her. But certainly the other items the Court mentioned certainly created probable cause for an arrest.

The Court first wants to deal with the statements on September 4th. And we've already had one hearing, and now another hearing....

. . . .

The issue on the statements—and I go back to what we talked about this morn-

ing. All of the statements on September 4th were taken well within the 49–hour [sic] period, and therefore fall under the fifth amendment analysis as per Justice Anderson's opinion in *Huddleston, State v. Huddleston.* And you look at any number of things. But primarily, or at least the first inquiry as to the admissibility of the statements of defendants looks to the conduct of the government, because the fifth amendment, as applied to the states by the fourteenth, is to prohibit the government in some manner of overcoming someone's free will not to talk.

Certainly the officers, the government have a right to use techniques of investigation. They have to do that. Undercover operations, informants, in fact, misleading people is—it's a very acceptable form of government investigation. You have to in certain scenarios, like we've all talked about. Most drug dealers are not going to sell drugs to people they know to be police officers. So therefore you have to have people acting as drug dealers. So, you know, it's all a matter of degree on those issues.

And so, as we started out on the 3rd, we had a scenario where Off. Kendall comes in, he advises the Defendant of her constitutional rights. And, in fact, this was the second trip to a police department. She was picked up earlier, quizzed, taken back home, and then later, after the other information was developed, she was arrested. For all practical purposes, she was arrested and brought to the police department for the second time.

Off. Kendall advised her of her rights. She made comments about her opinions of Off. Kendall, and she declined to give a statement to Off. Kendall, and she told Off. Kendall that she wanted an attorney. Off. Kendall quite properly suspended his questioning and went about his business as it related to the investigation and other matters. But he did not inform Off. Trentham of her desire to remain silent and/or to seek an attorney. Therefore, and Off. Trentham came in, he took a statement. As all parties acknowledged, that statement should and is suppressed by agreement, really.

So then we come to the statements of September 4th. And those are the crucial statements. The uncontradicted testimony—the uncontradicted testimony was that [the appellant] sought out someone to talk to. Officer—. . . Miracle. She asked Off. Miracle—she asked. In fact, Off. Miracle's only job at that point was to observe her. He wasn't part of the investigative team. And [the appellant] some hours later, totally independent of anything she had said to Off. Kendall—certainly to Off. Kendall, and certainly to Off. Trentham, she wanted to talk to someone. Off. Bean, he was called.

There is a handwritten statement by the Defendant which, in the Court's mind, totally, totally—I don't know, "destroy" is not the right word. But totally discredits Dr. Workman's opinion that she was unable to sequentially relate issues in this case. He did not talk about Off. Bean's—the first statement that this Defendant gave Off. Bean. She wrote that statement herself. He didn't write that, she wrote it.

And so then—and again, the Court held then, and I hold now, there was nothing that the officers in this case, especially Off. Miracle and Detective Bean did that attempted to overcome the free will or choice of [the appellant]. There's absolutely nothing that Off. Bean did, Off. Miracle did, or anyone else did that says the government did anything wrong.

Now, looking at the mental aspect. And, again—and I think Dr. Workman is a brilliant guy and he has opinions. Some people might agree with them, and that's fine. But his opinion is that if a Defendant has a mental problem, that officers should never talk to them. Well, that's not the law. Officers are not required to carry a psychiatrist in their hip pocket. We have not got to that point yet in this country. And so because someone is mentally ill or has mental problems does not mean officers cannot talk to them.

Now, there might be a situation where someone is insane that it is not a voluntary statement or has no indication of reliability so as to possible [sic] preclude its admissibility, even. But that's not what we're dealing with here. There is no question the uncontradicted testimony in this record, Officer after Officer whose credibility, in all candor, has not been impeached, is that when they spoke with her, at least on there—on the September 4th statements, that she appeared to understand what she was doing. There's no question about that.

And having found that there is no evidence that precluded [the appellant] from understanding the nature of the investigation, her constitutional rights, and, in effect, forcing her to give a statement, this Court must find that the statements of September 4 are free of any improper conduct on the part of the government in this case, and that those statements were so far removed from the statement of September 3rd, and so independent of that, and in fact, the first statement of September 4th given at the behest of this Defendant, the Court must find that those statements of September 4th are, in fact, admissible.

Now, certainly issues raised here today, the doctors' testimonies, certainly I expect, at least, you know—simply because they're admitted doesn't, of course, mean the jury has to accept them as true. And I'm sure the medical testimony and the psychiatric testimony is going to be there, and it'll be up to the jury to believe if what was contained in the statements are true. That's for them to decide. But, as for their admissibility, there's no question in the Court's mind.

Now, I made one misstatement this morning, and I need to clear up. I did not pick up, as I was talking, the last statement by [the appellant] on September the 5th. That is beyond the 48 hours. Okay? Now, looking at that statement, are you asking the Court to exclude that statement in the case?

. . . .

Okay. So in the case—in the State's case in chief it may not be admitted.

The case proceeded to trial, which commenced on April 12, 2004. At trial, the jury learned that late on the night of September 2, 2000, Suzanne Lytle dropped off her daughter, Leeann Abbott, and her daughter's roommate, Melissa Collier, at the trailer that they rented from the appellant and her husband, Garry Johnson. When the two women arrived at their trailer, the electricity was out. Ms. Abbott went to the green house where the appellant and her husband lived and paid Mr. Johnson one hundred dollars so that he would turn the electricity back on in the trailer. Catherine Dych, the appellant's mother, went over to the trailer later that night to get more money from Ms. Abbott and Ms. Collier.

Brad Finchum, another neighbor, visited the appellant, her husband, and the appellant's mother at the green house that night. After leaving the green house, Mr. Finchum went to the trailer to say goodnight to Ms. Abbott and Ms. Collier. Ms.

Collier told Mr. Finchum if anything happened with Lee Morton, Ms. Abbott's ex-husband, that night, that they might come to Mr. Finchum's apartment to use the telephone. At that point, Catherine Dych came over from the green house to get more money and Mr. Finchum went back to the green house with her where he smoked some marijuana and watched a movie.

At around 2:30 to 2:45 a.m. on September 3, 2000, Martin Ramsey and his wife Bertha were awakened by noises that sounded like someone beating on their windows. Both Mr. and Mrs. Ramsey got out of bed and looked outside, but did not see anything, so they returned to bed. Mr. Ramsey was unable to get back to sleep, and about fifteen minutes later started seeing flickers of light through the house. Thinking that a vehicle might have run off the road, Mr. Ramsey stayed in bed. Five minutes later, Mr. Ramsey's bedroom was lit-up from the fire at the trailer. He looked out the window and saw the fire. Mr. Ramsey went out on the porch and called 911. He was able to see two people in front of the trailer. One of the people was lying on the ground, covered in blood. The second person was kneeling over top of the person covered in blood. Mr. Ramsey could not identify either person at first, but was close enough to see that the person kneeling did not have anything in her hands. He thought that the person was administering CPR because he could see the kneeler's elbows going backwards and forwards. However, the person was not in a position to give CPR. Mr. Ramsey called out to the people, but he did not hear any response. When the person kneeling saw Mr. Ramsey approach, she made a quick retreat in the direction of the green house.

A large ditch prevented Mr. Ramsey from getting too close to the trailer. He had recently had back surgery and was unable to cross the ditch on foot. He could tell that the victim was still alive, as she arched up her back and moved around, asking for help. Mr. Ramsey could see that the victim's throat was cut open.

Around the same time that Mr. Ramsey noticed the fire outside, Tammy Abbott was driving along Ridge Road with her sixteen-year-old nephew. Ms. Abbott saw the flames, pulled her car over to the side of the road and ran down to the trailer to see what was going on. She called the Pigeon Forge Police Department to tell them the location of the fire. Ms. Abbott saw a person, later identified as victim Melissa Collier, coming out of the window of the trailer and falling to the ground. At trial, Ms. Abbott did not remember seeing any other people near the trailer. Her statement, however, indicated that she saw two people running away from the trailer when she was approximately thirty feet away. She was unable to discern whether the people running were male or female, but saw the people running toward the green house. Ms. Abbott did not see anyone kneel near Ms. Collier as she lay on the ground dying. Ms. Abbot saw Mr. Ramsey come from his house to the location of the fire, but did not hear him call out anything.

Mrs. Ramsey also heard the noises the night of the fire. When she looked out the window at the fire, she saw one lady kneeling over another lady. One of the women was lying on the ground and had blood all over her hair. Ms. Ramsey saw the kneeler jump up and run away when Mr. Ramsey approached. Ms. Ramsey claimed that she saw the kneeler standing in the bathroom window of the green house.

The police, including Corporal David Zavona, arrived a few moments later. Corporal Zavona was able to tell that Ms. Collier, the person lying on the ground

covered in blood, was still alive. Corporal Zavona and another officer dragged Ms. Collier away from the flames and heat.

Deputy Chief John Brackens of the Pigeon Forge Fire Department responded to the fire at the trailer. When he arrived, he learned that there was possibly a victim inside the trailer. He and several other firefighters attempted to enter the trailer. Using a flashlight and a pike pole, the firefighters pulled back the metal top of the mobile home and discovered the charred remains of Ms. Abbott.

Special Agent Joe Cuccia of the State Bomb and Arson Section was assigned to investigate the origin and cause of the fire on Ridge Road. During the investigation, Special Agent Cuccia found an ignitable liquid pour patter that extended from the back bedroom, where the body of Leanne Abbott was recovered, through the living room front door and down the porch, ending at the front steps. The ignitable liquid was later identified as a kerosene-range distillate. As a result of the discovery of the ignitable liquid, the fire was ruled as "intentionally set."

Detective Rene Kendall of the Pigeon Forge Police Department arrived on the scene of the fire and double murder to investigate the crime. He was told that several people had been seen peeking out of the window of the green house that faced the trailer. As Detective Kendall approached the house, he noticed what appeared to be a smudged bloody fingerprint on the door as well as a single drop of blood on the door. Garry Johnson answered the door to the green house. Inside the residence were Garry Johnson, the appellant, Catherine Dych, and Ms. Abbott's youngest child, Nicholas.

Detective Kendall spoke with the appellant and asked her for information about the incident. The appellant told Detective Kendall that she was in the bathroom when she noticed a "glow" outside the window. At that time, she looked out the window and saw the trailer on fire. According to the appellant, she ran out of the house, losing her sweat pants on the way. She saw Ms. Collier crawling down the steps of the trailer. When she approached Ms. Collier, she bent over Ms. Collier and asked her if she was alright. The appellant stated that she never touched Ms. Collier. When Mr. Ramsey approached the scene and asked her if everything was alright, the appellant told him to call 911. At that point, the appellant claimed that she walked back to her home where Mr. Johnson was waiting on the porch. When she pushed the door open, Mr. Johnson told the appellant that she had blood on her hands.

The appellant was transported to the police department around 5:30 a.m. and questioned by Detective Kendall and then returned to the green house at around 7:00 a.m. Upon their return to the green house, Detective Kendall asked the appellant for consent to search the residence. The appellant asked to call her husband prior to giving consent to search the residence. Mr. Johnson stated that he wanted "to be present during the search." While Detective Kendall and the appellant were waiting for Mr. Johnson to return, Detective Kendall saw the appellant put something underneath her shirt. The appellant gave Detective Kendall a "large marijuana cigarette."

The appellant called her husband again, and Mr. Johnson told the appellant to consent to a search. So, at 12:15 p.m., the appellant signed a consent to search the residence. During the search, Detective Kendall asked the appellant to open two garbage bags. The appellant untied the bags, telling Detective Kendall that they contained kitty litter. Inside the bags were men's and women's clothing covered

in blood, two guns, two knives and latex gloves. When the discovery was made, the appellant claimed that she did not know what the items were. In fact, when Catherine Dych walked into the room, the appellant exclaimed, "Mother, what the fuck is this? What the fuck have you done?" At that point, around 12:40 p.m. on September 3, 2000, the appellant was taken into custody and transported back to the Pigeon Forge Police Department.

At 12:57 p.m., the Sevier County Ambulance Service received a dispatch to the police department with the report of possible seizure. When ambulance personnel arrived on the scene at 1:00 p.m., they found the appellant breathing rapidly into a paper bag. James De La Cruz, a paramedic that responded to the call, was told by the appellant that she had not taken her medication because she had been arrested. The appellant refused service, but requested her medications. The appellant's chief complaint was anxiety and she was oriented to time, place, and location. According to Mr. De La Cruz, the appellant answered his questions coherently and showed no symptoms or evidence of a seizure. The appellant signed an EMS refusal order, refusing transport to the hospital.

Officer Jessica Lewis–Wear was assigned to observe the appellant as she was being kept at the police department in a booking room. When she first saw the appellant, the appellant was crying and shaking. After crying for about thirty minutes, the appellant fell asleep. According to Officer Lewis–Wear, the appellant was coherent and made sense when she was talking. Officer Jessie Miracle relieved Officer Lewis–Wear when her shift was over. Officer Miracle also described the appellant as coherent.

Detective Tim Trentham had the opportunity to question the appellant during the course of the investigation, after the appellant refused to talk to Detective Kendall.[3] The appellant made the following voluntary statement to Detective Trentham:

Around dusk on 9/2 of 2000, Lee Morton came into my house carrying a black semi-automatic handgun. Lee asked Garry Johnson if he could fix the firing pin. Lee said it didn't fire correctly. They discussed it being a 40.[I] didn't know what they were talking about. Lee also had a Tek–9. Garry told Lee he couldn't fix the gun.

Matt Reed and Lee left in Garry's truck approximately 9:30 p.m. Leanne Abbott came to the house after she got off work. She normally got off work around 2200 so it was around 2230 hours 10:30 p.m.). She paid Garry $100 for the rent she owed. Leanne told Garry she would get the remaining money from Melissa Collier next door at the trailer. Leanne left and was gone 39 minutes. Kathryn Dych then went next door to the trailer to collect rent from Melissa. Kathryn returned in four minutes. She said Melissa argued as to when the rent was due. Kathryn gave $100 to Garry.

[L]ater in the early morning hours, around 0200, Garry said he was going out to his toolshed. Me and momma watching tv, almost asleep. About 40 minutes later Lee Morton came through back door. He had on a white shirt and a pair of my blue jeans, black tennis shoes with a white stripe. The jeans had blood all over the legs.

I asked Lee, "What have you done?" Lee quickly undressed, with Kathryn

---

**3.** Despite the trial court's pretrial ruling declaring the statement taken by Detective Trentham inadmissible, counsel for the appel-

lant waived the trial court's ruling and used the statement during cross-examination of Detective Trentham.

bagging the bloody clothing in a white plastic grocery bag. She then placed the bag into a trash can. As Lee was dressing, I saw Garry just outside the back door near the toolshed. He was dressed in all black with his hair pulled up into his cap. Garry was placing a latex glove onto his left hand.

Lee left the house on foot. At that point Garry comes in freaking out carrying a black semi-automatic handgun that Lee had brought him earlier. Garry yelled, "I shot her twice, but the bitch isn't dead yet. I ran out of bullets." I got real freaked out and went to the restroom to urinate. While in the bathroom, I heard what I believe to be a gunshot [c]oming from the area of the trailer. I looked out the window and saw the trailer on fire. I saw Melissa crawling on the steps. I ran out the door and to the trailer to check on her. I asked if she was okay. I received no response.

At this time the trailer was burning. The most around the middle and the front. A neighbor yelled to see if I was okay. I told him to call 9–1–1. I walked back home. When I got there, Kathryn told me to take off my pants. I saw blood all over them. I also had blood on my hands. I took off my white pants and gave them to Kathryn. She put them in a trash can. At this point Garry was in the bathroom undressing, and he got into the shower. Shortly thereafter Garry came from the bathroom, and there was a knock at the door. It was Brad Finchum from next door. He asked if we saw or heard all the sirens.

I did not hurt or in any way harm Melissa or Leanne or start a fire. This is a true and accurate statement to the best of my knowledge.

Both Detective Trentham and the appellant signed the statement.

The appellant next requested to speak with Detective Kenny Bean on Monday, September 4, 2000, at around 11:45 a.m. Detective Bean advised the appellant of her rights, and the appellant executed a written waiver form. The appellant's statement to Detective Bean was as follows:

Night of the fire was at home with Garry, my mother, and my nephew Nicholas. Sat around and watched movies. Mom was talking to Garry in another part of the house where he makes signs, [in the] workroom, in a low tone of voice. Mom had been talking to Garry for months about killing Leanne because she felt that Leanne abused Zachary verbally, and abused Nicholas physically and verbally.

Lee Morton had told numerous people for the last four years that he didn't need her. Their, Lee and Leanne, fighting had gotten worse in the last year. That evening Lee, Matt Reed, and Garry were talking. I don't know what they were discussing. Lee wanted to borrow my car and I wouldn't let him take it. He would have taken it to one of the projects in Knoxville and bought crack. They left in Garry's truck, Lee and Matt. Garry stayed at home. About 10:30 p.m. Leanne and Melissa came home, Leanne's mother [brought them home]. Leanne came over and asked me if I had a joint. I did, but I didn't give it to her. She said that the power was off, and Garry told her for $300 he could fix it. Leanne said, "Between us we have $300," but they wanted to keep some.

Leanne said she would give us $100. She laid $100 on the table, and Garry and her went to the trailer and fixed the problem. Garry had been drinking and

eating pills, Klonopins. He said Leanne would bring over the other $100 in a few minutes.

I'm neurotic and I count things, and it had been 39 minutes. This was sometime after 11:00, around 11:20 p.m. I told my mom to get the remaining $100, that I didn't want to go because I had been in a fight with Melissa I think the day before. Mom left, was gone three or four minutes, and came back with the money, $100. They were going to pay the remaining $100 the next day. Garry and mom are now talking low in the work area. Mom came into the living room around six minutes later. We watched *The First Wives Club*. We didn't get completely through the movie, and Garry went out to the toolshed. He was working on his banner. He closed the back door behind him. That was strange, because he didn't usually do that.

Between 1:30 a.m. and 2:00 a.m. Garry comes through the back door. He is freaking out, looked like he lost his mind. I've never seen him panic like this. He had [his] hair pulled back and tucked into his cap. He had on a yellowish-beige color latex gloves [sic] and was carrying his gun, a Tek–9, and he said, "She's not dead. She's not dead." He's pacing back and forth. I looked at him and said, "Who's not dead?" And he said, "Melissa." I looked at him and he opened his eyes real wide and said, "The bitch won't die." He jerked me up and said, "Let's go." I went through the kitchen and opened up a silverware drawer and got a butcher knife and we went to the trailer.

I went straight across the yard, and Garry was ducking behind my car and went that way. I got on the porch, and then Garry did, and Garry went to open the door and it was locked. He kicked the door three times and it didn't open.

And then on the fourth kick it did. He went in first, and I was turning to leave, and he grabbed me, and the back of my shirt, and said, "Whoa." Garry went in, and I walked backwards because he was holding on my shirt. I turned around and saw Melissa in the livingroom [sic] near the TV lying on the floor, she [was] covered with blood.

Garry says that he lost a clip to the gun and it had two more bullets in it that I needed. Melissa was gurgling and Garry was running around like a chicken with its head cut off. Garry is telling me what happened. He told me that he had put two in Leanne's chest and one in her head. Something I forgot was that Brad Finchum was over at Leanne's and Melissa's when mom went over to get the money, and she brought him back. When Brad came back, he told me that Leanne was going to bed and Melissa was on the couch. I'm standing over Melissa staring down at her. Garry found his clip. I'm standing there over Melissa with my knife. Garry came over, pointed the gun at her head, pulled the trigger, and nothing happened. It just clicked. Garry said, "Oh God, it's jammed." I yelled at him, "Fix it or do something." She was laying there suffering. Garry couldn't fix it. He starts freaking out. I kneel down and thrust the knife into Melissa around the chest area. I could feel it going in and ripping through her. I could feel it going in, the vibration of it.

Garry had told me that he had shot Melissa twice in the chest, and that he was going to shoot her once in the head, and that he ran out of bullets and that he lost his clip or something. Melissa didn't move after I stabbed her or before. I thought she was dead. Garry says, "The police may come and we've got to get out of here." Garry leaves

and so do I. Garry tells me at this time that he is just going to burn it up or burn it down. He said he didn't want Lee to see and to maybe get rid of the evidence. I went to my house and came through the front door and Garry [c]ame through the back door.

I told mom bits and pieces as we were going into the bathroom. She told me to get my clothes off, and I washed my feet off and leg. I put on my night pants and took off T-shirt. While I was in the bathroom I saw the flames through the bathroom window. I saw Melissa dragging her body with her arms down the steps of the trailer. She collapsed. I ran out of my house. I had my pajama pants on, white, and my black bra. I still had the butcher knife, and I ran to Melissa and just started stabbing her everywhere. I put the knife on one side of her neck and pulled it toward the other. I just stabbed her all over. Then someone yelled, "Are you all right?" And I said, ["][C]all 9–1–1, the police, call the ambulance, fire department." Then I went back to my house and pushed the front door open and washed my hands, took off my pajama pants. My mom did something with my clothes, pants, and bra. I don't even know what Garry was doing, except that he did take a shower, and mom told him to blow dry his hair.

The appellant reviewed this statement, wrote out a nearly identical statement in her own handwriting, and signed the statement. The appellant also drew a picture of the knife she used to stab Melissa Collier.

The day prior to the murders, Officer Randall James Smith, Jr. of the Pigeon Forge Police Department had been dispatched to the green house in response to a reported fight between the appellant and Melissa Collier. Upon arrival, Officer Smith noticed that both women had scratch marks to their necks and upper chest area and their necklaces had been torn off. Officer Smith described the appellant as agitated and angry and described Melissa Collier as calm.

The physical evidence seized from the green house was analyzed by the Tennessee Bureau of Investigation. The blood smear found on the front door of the green house contained an unknown female's blood as well as the blood of the victim, Melissa Collier. The single drop of blood matched the DNA profile of the unknown female. The third swab taken from the front door matched the DNA of victim Melissa Collier. One of the knives recovered from the trash at the green house matched the blood of Melissa Collier. Additionally, blood on a latex glove, a magazine from an Intertek–9 handgun, and a Glock handgun matched the blood of Melissa Collier. The clothing that was found in the trash at the green house, including the appellant's shirt and jeans as well as Garry Johnson's black jeans also had blood on them that matched Melissa Collier's blood. Melissa Collier's blood was also found on the appellant's pajamas.

Dr. Cleland Blake, Assistant State Chief Medical Examiner, performed the autopsy on Leanne Abbott. According to Dr. Blake, Ms. Abbott's body was severely burned, and there was extensive charring of the arms and legs. The front surface of the body and head had been subjected to severe destruction. Upon examination, Dr. Blake identified an extensive number of stab wounds and bullet wounds that went completely through the body. The cause of death was determined to be internal bleeding from multiple stab wounds and gunshots.

Dr. Blake also performed the autopsy on Melissa Collier. Ms. Collier suffered stab wounds behind and below her left ear, knife wounds consistent with a knife being

pulled across her neck, several stab wounds on the right side of the head, and blunt force trauma to the top front and top left side of the head. Additionally, Ms. Collier had stab wounds in the upper left arm, forearm, and left hand as well as defensive wounds on the back of the left wrist. There was a gunshot entry wound in the upper right arm. The cause of death was determined to be bleeding into the chest from the multiple stab wounds combined with the blood loss from the numerous other stab wounds.

At trial, the appellant presented expert medical testimony on her own behalf. Dr. Charles Rodwell's testimony was consistent with his testimony at the suppression hearing. He testified that the appellant was having hallucinations at the time he first began treating her and that she was taking several different prescription medications. Nevertheless, Dr. Rodwell testified that he did not find anything that would indicate that the appellant was incompetent in any way.

Dr. Edward Workman, a neuropsychologist, testified that he reviewed documentation to determine the appellant's mental competency at the time she was taken into custody and gave statements to the police. Dr. Workman noted that the appellant was taking a number of medications that had been prescribed by different doctors. In fact, Dr. Workman pointed out that the appellant was taking Ultram, a medication that can cause seizures when taken in conjunction with antidepressants that had been prescribed for the appellant. Additionally, Dr. Workman noted that the appellant was using marijuana, drinking alcohol and taking Oxycontin. After a review of the appellant's medical records, Dr. Workman opined that the appellant's behavior was highly consistent with having a seizure. As a result, Dr. Workman felt that the appellant was in a postictal state during the period in which she gave statements to the police and was therefore incompetent at the time.

In rebuttal, the State called Dr. William Bernet, a forensic psychiatrist. Dr. Bernet reviewed the appellant's extensive medical records and psychiatric records as well as the appellant's statements to the police. Dr. Bernet opined that the appellant was having an anxiety attack that resulted in hyperventilation. Thus, in Dr. Bernet's opinion, the appellant was competent to waive her *Miranda* rights.

At the conclusion of the proof, the jury found the appellant guilty of first degree murder in regards to the death of Melissa Collier and facilitation of the first degree murder of Leanne Abbott. The appellant waived jury sentencing. At a subsequent sentencing hearing, the trial court sentenced the appellant to life without parole for first degree murder and a concurrent sentence of twenty-five years for the facilitation of first degree murder conviction. The trial court denied a motion for new trial, and the appellant filed a timely notice of appeal. On appeal, the appellant argues that: (1) she was not mentally competent to waive her constitutional rights to give a statement to the police regarding her involvement in the death of the victims when she was not taking her medication; (2) the evidence was insufficient to support her conviction for facilitation of first degree murder; and (3) the trial court's imposition of a sentence of life without parole is invalid because the State's written withdrawal of its intent to seek the death penalty operated as a withdrawal of the State's intent to seek a sentence of life without parole and the appellant was not provided with written notice of the State's intent to seek life without parole as required by the statute.

### Analysis

#### Motion to Suppress

First, the appellant argues that her lengthy history of mental illness and poly-substance abuse that included both licit and illicit drugs coupled with being deprived of those drugs while being detained by the Pigeon Forge Police Department operated to make her statements to the police involuntary because she was incompetent to waive her *Miranda* rights. In other words, the appellant argues that the trial court improperly denied the motion to suppress the appellant's inculpatory statements. The State argues that there was "no evidence that precluded the defendant from understanding the nature of the investigation, and as such, her statements ... were free of any improper conduct on the part of the government and thereby admissible."

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn.1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn.2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn.1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn.1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. The trial court's determination at the suppression hearing that a confession was voluntary is presumptively correct on appeal. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn.1994).

The Fifth Amendment to the United States Constitution provides in part that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions," the accused "shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the United States Supreme Court held that a suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Id.* at 479, 86 S.Ct. 1602. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. *Id.* Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*. *Id.* at 444, 86 S.Ct. 1602. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. *Stephenson*, 878 S.W.2d at 545.

 The fact that one suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving constitutional rights. *See generally State v. Middlebrooks,* 840 S.W.2d 317, 327 (Tenn.1992); 4 Wharton's Criminal Evidence § 643 (14th ed.1987). A person with a mental deficiency may waive his *Miranda* rights if that waiver was knowingly and voluntarily made. *State v. Green,* 613 S.W.2d 229, 233 (Tenn.Crim. App.1980); *Braziel v. State,* 529 S.W.2d 501, 505–06 (Tenn.Crim.App.1975). When determining whether an accused has voluntarily, knowingly, and intelligently waived his *Miranda* rights, this Court must consider the totality of the circumstances which existed when the accused waived these rights. *Middlebrooks,* 840 S.W.2d at 326; *State v. Benton,* 759 S.W.2d 427, 431 (Tenn.Crim.App.1988). The "totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension.' " *State v. Blackstock,* 19 S.W.3d 200, 208 (Tenn.2000) (quoting *State v. Stephenson,* 878 S.W.2d 530, 545 (Tenn.1994)). In determining if a confession was voluntary, courts are to consider the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston,* 924 S.W.2d 666, 671 (Tenn.1996) (citing *State v. Readus,* 764 S.W.2d 770, 774 (Tenn.Crim.App.1988)). However, no single factor is necessarily determinative. *Blackstock,* 19 S.W.3d at 208.

 The appellant's competence to waive her *Miranda* rights herein was a finding made at the suppression hearing. The trial court considered the totality of the circumstances and found the appellant had made two voluntary waivers of her rights when she made incriminating statements to the police on September 3 and 4, 2000. The trial court indicated it considered the circumstances surrounding the appellant's confession, including the testimony of the psychiatrist and neuropsychiatrist as well as the forensic psychiatrist, and it found the appellant was able to appreciate the circumstances and consequences of giving a statement to law enforcement officers despite the fact that she was not taking her medication. The trial court determined that the appellant was advised of her rights and signed a form indicating she understood those rights. Moreover, even if it can be said that the trial court found that the appellant suffered from some mental deficiencies, such a finding does not necessarily prevent her from understanding and waiving her constitutional rights. *Middlebrooks,* 840 S.W.2d at 327.

This determination is presumptively correct and places the burden on the appellant to show the evidence preponderates against it. The appellant has failed to meet this burden. The appellant submits that the testimony and evidence presented by Dr. Workman at the hearing on the motion to suppress showed that the appellant was suffering from a sudden withdrawal from her medications, suffered

a seizure, and was in a postictal state thus rendering her incompetent to waive her rights. The trial court, however, was able to evaluate the credibility of the evidence pertaining to the appellant's mental state and specifically discredited the testimony of Dr. Workman, finding it unpersuasive. Moreover, Dr. Bernet testified that in his opinion that appellant was competent to waive her *Miranda* rights and make a voluntary statement. In addition, the officers assigned to watch and question the appellant testified that they did not observe any abnormal or erratic behavior that would indicate a lack of understanding by the appellant of her rights and the consequences of waiving those rights. The trial court found the circumstances surrounding the statements made by the appellant on September 4, 2000, to be non-coercive and the appellant's mental functioning was adequate to make the waiver. The appellant's assertions that the deprivation of her medications and sudden withdrawal of those medications caused a seizure, which she argues rendered her incapable of making a knowing waiver, simply do not preponderate against the findings of the trial court. We conclude the trial court did not err in finding the appellant made a knowing and voluntary waiver of her rights and, therefore, the statements made by the appellant were properly admitted.[4]

### Sufficiency of the Evidence

■ Next, the appellant challenges the sufficiency of the evidence in regards to her conviction for facilitation of the first degree murder of Leanne Abbott. Specifically, the appellant contends that "there is no evidence of [sic] this record that in any way proves that [the appellant] knew in

advanced [sic] that another person was going to murder Leeann Abbott … [nor] is their any evidence in this record that [the appellant] knowingly furnished substantial assistance in the commission of the murder." The State argues that, while circumstantial, the evidence is more than sufficient to support the conviction.

■ When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn.1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn.1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R.App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof.

4. The appellant does not challenge the trial court's decision to exclude the first statement made to Detective Trentham after the appellant requested an attorney. In fact, ap-

pellant's counsel introduced that rather exculpatory statement at trial during cross-examination.

*State v. Morgan,* 929 S.W.2d 380, 383 (Tenn.Crim.App.1996); *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn.Crim.App.1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews,* 805 S.W.2d at 779. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *See State v. Morris,* 24 S.W.3d 788, 795 (Tenn. 2000); *State v. Pappas,* 754 S.W.2d 620, 623 (Tenn.Crim.App.1987). Further, in *State v. Reid,* 91 S.W.3d 247, 277 (Tenn. 2002), our supreme court restated the holding of *State v. Smith,* 868 S.W.2d 561, 569 (Tenn.1993), which cited *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn.1985), that "[a] conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.' "

First degree murder is the "premeditated and intentional killing of another." Tenn.Code Ann. § 39–13–202(a)(1). Facilitation is established by proof that the accused knew another person intended to commit a specific felony and knowingly furnished substantial assistance in the commission of the felony. Tenn.Code Ann. § 39–11–403(a). Therefore, the State was required to prove the commission of a specified felony and the assistance the appellant gave to the person committing the specified felony. *State v. Parker,* 932 S.W.2d 945, 950–51 (Tenn.Crim.App.1996).

Viewing the evidence in the light most favorable to the State, the proof at trial established that the appellant and her husband murdered Melissa Collier and Leanne Abbott. The appellant admitted that there had been discussions among her husband and mother about killing Leanne

Abbott because she allegedly abused her children. The appellant knew that Leanne Abbott was at the trailer earlier that night because Leanne Abbott had visited the green house to give money to the appellant and her husband on her way home. Further, the appellant admitted that her mother and Brad Finchum visited the trailer on the night of the incident. Brad Finchum even told the appellant that when he left the trailer, Leanne Abbott was going to bed in her bedroom and Melissa Collier was laying on the couch. The appellant knew that her husband shot Melissa and went to the trailer with her husband after her husband exclaimed that the "bitch" would not die. On her way to the trailer with her husband, the appellant admitted grabbing a knife. Once inside, the appellant described repeatedly stabbing Melissa Collier. There was testimony from the medical examiner that Leanne Abbott also died from multiple gunshot wounds and stab wounds. The appellant claimed that her husband was in possession of the guns, but did not ever claim that her husband used the knife to stab anyone. The police found two bloody sets of clothing, two guns, and two knives at the green house. While the appellant denied being Leanne Abbott's killer and the police never directly asked her if she was involved in the death of Leanne Abbott, we determine that there was sufficient circumstantial evidence presented at trial with which a jury could determine beyond a reasonable doubt the appellant knew her husband intended to kill Leanne Abbott, and the appellant knowingly furnished substantial assistance in the commission of that felony.

### Notice of Intent to Seek Life Without Parole

Lastly, the appellant argues that her sentence of life without parole for the first degree murder of Melissa Collier is invalid

because the State's withdrawal of its written notice to seek the death penalty also operated as a simultaneous withdrawal of the State's intention to seek life without the possibility of parole. Specifically, the appellant contends that her sentence of life without parole must be vacated because the "State did not file a separate written notice of intent to seek life without the possibility of parole pursuant to T.C.A. 39–13–208(b)." The State counters that the appellant received proper notice of the intent to seek a sentence of life without parole and that the appellant was fully aware of that intent at trial. Further, the State asserts that the appellant has waived this issue by failing to object at trial, by waiving jury sentencing and by acknowledging to the trial court that she was aware she could receive a sentence of life without parole.

On August 23, 2001, shortly after the appellant's indictment by the Sevier County Grand Jury, the State filed a formal notice of its intention to seek the death penalty. On March 29, 2004, several days prior to trial, counsel for the appellant faxed a proposed jury questionnaire to the district attorney general. On March 31, 2004, the district attorney general handwrote "we are not seeking the death penalty" on the fax cover sheet and faxed the cover sheet and questionnaire back to counsel for the appellant. As a result, a non-death penalty qualified jury was selected for the trial.

At the conclusion of the first day of trial, after jury selection and testimony from the first seven witnesses for the State, the trial court commented, "Okay, And then, although it's not been, I think officially put in the record as such, but the State has advised the defense they are not, obviously, seeking the death penalty, and we all knew that before we started our trial." The District Attorney responded, "That's correct, Your Honor. Life without the possibility of parole." After the jury reached its verdict, the appellant acknowledged that she was facing a sentence of life without the possibility of parole or a sentence of life with the possibility of parole. The appellant waived her right to have the jury decide her sentence in a bifurcated trial and elected to have the trial court determine the sentence. At the sentencing hearing, the trial court sentenced the appellant to life without the possibility of parole.

At the hearing on the motion for new trial, counsel for the appellant argued that while he received verbal notice at trial that the State was seeking a sentence of life without the possibility of parole, Tennessee Code Annotated section 39–13–208 and *State v. Gilliland*, 22 S.W.3d 266 (Tenn. 2000), require a separate written notice be filed by the State stating its intention to seek a sentence of life without parole. After hearing the well-reasoned argument of counsel, the trial court determined the following:

[T]he Court is called upon to construe the facts of this case under the guidelines of State versus *Gilleland* [sic]. That case very properly talks about and interprets the statutory provisions and the rules of a criminal procedure as it relates to the filing and withdrawing of a death penalty notice, as has been stated by both counsel.

The filing of a notice to seek the death penalty likewise includes a notice that the State in the alternative is seeking life without the possibility of parole as an option for the jury to consider.

The *Gilleland* [sic]case ... And obviously each case has to stand or fall on its own merits. And the Supreme Court in this case made it very clear, especially that a written withdrawal of notice to seek the death penalty likewise includes

a withdrawal of the notice to seek life without the possibility of parole.

The *Gilleland* [sic] case very properly deals with the issue of the written notice. now, here we come in this case on the day of trial. . . .

. . . .

The Court in all candor would have to state that the seeking. . . . Or that the sending of that notice would act, in all candor, as a withdrawal of the notice to seek life without parole under the *Gilleland* [sic] case. Then the issue becomes whether or not the State, on the day of trial, indicating that it intends to seek life without parole is an effective reaffirmation under the Rule.

While it does not . . . [w]hile the Rule nor the opinion in *Gilleland* [sic] talks about the specific facts, situation that has arisen in this case. The purpose of the statute and the purpose of the Rules of Criminal Procedure are to give the defendant notice that the State is seeking the penalty of life without the possibility of parole.

In all candor, while the Court wishes that the proper notice had been given, at the time the trial was started, the guilt phase of the trial was started, unlike the facts of the case in *Gilleland* [sic], the defendant, the attorneys and the Court, as well as the jury was notified that the State was seeking life without the possibility of parole.

The court finds that the notice, while given late, at least before the jury was picked, everyone knew that the State was seeking the possibility of life without parole as a sentence option. And in the last paragraph of the *Gilleland* [sic] opinion the Supreme Court noted that we hold that the State's withdrawal of its original notice of its intention to seek the death penalty without more also op-

erated as a withdrawal of its intention to seek life without parole.

The Court finds in this case everyone knew and acknowledged that they knew that the State was seeking life without the possibility of parole and that the facts of this case, in the Court's opinion, are significantly different than the facts in the case of *State versus Gilleland* [sic]. . . .

[T]he Court finds that beyond a reasonable doubt, that any error in that process was harmless and overrule that issue.

Tennessee Code Annotated section 39–13–208 states, in pertinent part:

(a) Written notice that the state intends to seek the death penalty filed pursuant to Rule 12.3(b) of the Tennessee Rules of Criminal Procedure shall constitute notice that the state also intends to seek as a possible punishment a sentence of imprisonment for life without possibility of parole.

(b) Where a capital offense is charged in the indictment or presentment and the district attorney general intends to ask for the sentence of imprisonment for life without possibility of parole, written notice thereof shall be filed not less than thirty (30) days prior to trial. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion by the defendant, a reasonable continuance of the trial. The notice shall specify that the state intends to seek the sentence of imprisonment for life without possibility of parole and the notice shall specify the aggravating circumstance or circumstances the state intends to rely upon at a sentencing hearing. Specification may be complied with by a reference to the citation of the circumstance or circumstances. Such notice shall be in writing and filed with the court and served on counsel.

(c) If notice is not filed pursuant to subsection (a) or (b), the defendant shall be sentenced to imprisonment for life by the court if the defendant is found guilty of murder in the first degree.

Tenn.Code Ann. § 39–13–208(a), (b), & (c).

In *Gilliland,* the Tennessee Supreme Court held that the State's withdrawal of its original notice of intention to seek the death penalty, without more, also operated as to withdraw notice of its intention to seek a sentence of life without parole. In *Gilliland,* the State filed its notice of intent to seek the death penalty shortly after indictment of the defendant. Three months later, the State notified the defendant by copy of a letter sent to the trial court that it was "electing not to pursue the death penalty." *Id.* at 275. After the guilt phase of the trial, the State reaffirmed its intent to seek a sentence of life without parole. The appellant objected and argued that the State's withdrawal of its notice to seek the death penalty also operated as a withdrawal of its intent to seek life without parole. The Tennessee Supreme Court determined:

> The issue of whether a withdrawal of an intention seeking the death penalty is also a simultaneous withdrawal of an intention to seek life without parole is an issue of first impression in this state. This issue must be resolved with reference to the notice statutes, and in interpreting these statutes, we should bear in mind that "the fundamental role of this Court in construing statutes is to ascertain and give effect to legislative intent." *State v. Mixon,* 983 S.W.2d 661, 669 (Tenn.1999). In ascertaining the intent of the legislature, this Court may look to "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." *State v. Lewis,* 958 S.W.2d 736, 739 (Tenn.1997).

Tennessee Rule of Criminal Procedure 12.3(b) provides that in all cases in which the State intends to seek the death penalty, "written notice thereof shall be filed no less than thirty (30) days prior to trial." In Tennessee, capital defendants are also on notice that the state's intention to seek the death penalty "shall constitute notice that the state also intends to seek as a possible punishment a sentence of imprisonment for life without the possibility of parole." Tenn. Code Ann. § 39–13–208(a) (1997). When the state does not intend to seek the death penalty in a capital case, section 39–13–208(b) further requires that the state give pre-trial written notice of its intention to seek life without the possibility of parole when this penalty is sought. A failure to give timely notice results in a "reasonable continuance of the trial" upon motion of the defendant, *id.,* whereas a complete failure to give this notice results in the defendant being sentenced to life imprisonment upon the defendant's conviction of first degree murder. *See* Tenn.Code Ann. § 39–13–208(c).

The State argues in this case that the withdrawal of its intention to seek the death penalty "simply cannot be read to include a withdrawal of the notice to seek life without parole." Rather than operating as an implicit withdrawal of an intent to seek any greater punishment, the State argues, the "letter merely announced [nothing more than] an intent not to seek the ultimate punishment of death." We cannot agree.

When the state seeks the punishment of life without parole, the notice statutes are clear that written notice of this intention must first be given to the defendant. Section 39–13–208(a) partially re-

lieves this burden by allowing a notice of intention to seek the death penalty to simultaneously serve as a notice of intention to seek life without parole. When the state chooses not to seek the death penalty, however, the statutes are clear that a separate notice of its intention to seek life without parole must be given before the state may seek that punishment. Logic dictates that when a single writing serves as notice of two separate intentions, i.e., an intention to seek death and an intention to seek life without parole, then a withdrawal of that single writing must also serve as a withdrawal of both intentions. To conclude otherwise, especially when the General Assembly has specifically required separate notice of the possibility of life imprisonment when death is not sought, defeats the very purposes of the notice requirements. If the State in this case desired to seek life without parole even after withdrawing its original notice, it could have easily filed a separate written notice to this effect with the trial court, or at least given some indication of this fact in the letter withdrawing its original notice.

The State also argues that the failure to provide actual notice of its intent to seek life without parole should be excused because no prejudice was suffered by the appellant. Without ruling on the merits of this argument, we note that the statute itself does not excuse a failure to notify when no prejudice inures to the defendant. Rather, the statute is clear and unambiguous as to the procedures to be followed when state does not give notice: "If notice is not filed pursuant to subsection (a) or (b), the defendant shall be sentenced to imprisonment for life by the court if the defendant is found guilty of murder in the first degree." Tenn.Code Ann. § 39–13–208(c). When the language of a statute is clear and unambiguous, we are not at liberty to depart from the commands of the plain language. *See, e.g., Hawks v. City of Westmoreland,* 960 S.W.2d 10, 16 (Tenn.1997). Accordingly, we decline to hold that a lack of actual prejudice excuses a failure to give notice.

In addition, the State's arguments concerning lack of actual prejudice ignores the fact that the decision by the state to seek death or life without parole can have significant intangible effects on the defendant's case. For example, the state's decision may influence a defendant's decision to enter plea negotiations, and it will often affect decisions regarding the evidence offered or withheld by the defendant. In addition, the state's decision will require the gathering and marshaling of evidence relevant to aggravation and mitigation of sentence, which in turn may require the services of investigators and expert witnesses. Indeed, because of the importance of these intangible considerations, the state is always required to give notice before trial. *See* Tenn.Code Ann. § 39–13–208(b).

Accordingly, we hold that the State's withdrawal of its original notice of its intention to seek the death penalty, without more, also operated to withdrawal notice of its intention to seek life without parole. In the interests of judicial economy, we modify the appellant's sentence in accordance with Tennessee Code Annotated section 39–13–208(c) to imprisonment for life.

*Gilliland,* 22 S.W.3d at 275–76.

 While the facts of the case herein are arguably distinguishable from the facts in *Gilliland* for several reasons: (1) the appellant had actual verbal notice of the State's continued intention to seek a sentence of life without parole prior to the start of the trial; (2) the appellant did not

object to the State's verbal intent; (3) the appellant waived jury sentencing; and (4) the appellant admitted at the sentencing hearing that she was facing either a sentence of life without the possibility of parole or a sentence of life with the possibility of parole, we are unable to escape the plain, unambiguous language of the statute as interpreted by the supreme court in *Gilliland* which requires the State to give written notice of its intent to seek a sentence of life without the possibility of parole. The Supreme Court made clear in *Gilliland* that the withdrawal of an intention to seek a death sentence operates as a simultaneous withdrawal of an intention to seek life without parole. Once the withdrawal of the intention to seek a sentence of life without parole is made, the statute requires the State to file a written notice of its intent to seek a sentence of life without parole. Despite the appellant's apparent acquiescence to the State's failure to follow the mandates of the statute and the fact that the appellant received actual verbal notice of the State's intent with regard to sentencing prior to trial which resulted in a lack of actual prejudice to the appellant at trial, we cannot escape the supreme court's holding in *Gilliland* in

regards to the importance and mandatory nature of the written notice pursuant to Tennessee Code Annotated section 39–13–208 that the lack of written notice mandates a sentence of life with the possibility of parole. Thus, we are compelled as the supreme court was in *Gilliland*, in the absence of a written notice filed by the State to seek a sentence of life without parole and, in spite of the heinous nature of the crimes, to modify the appellant's sentence on the conviction for the first degree murder of Melissa Collier to life with the possibility of parole after service of 51 years of incarceration. See Tenn. Code Ann. § 40–35–501.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed and the appellant's sentence is modified from life without the possibility of parole to life imprisonment with the possibility of parole.