# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 11, 2007 Session

## STATE OF TENNESSEE v. DERRICK SETTLES

**Appeal from the Criminal Court for Shelby County**
**No. 03-02541     Arthur T. Bennett, Judge**

_____

**No. W2006-02350-CCA-R3-CD  - Filed November 26, 2007**

_____

The Defendant, Derrick Settles, was convicted of two counts of first degree murder and two counts of possession of over .5 ounces of marijuana with the intent to sell.  The jury sentenced him to life without the possibility of parole for one murder conviction, and the trial court ordered a consecutive life sentence for the other.  The trial court also merged the possession offenses into a single conviction and imposed a concurrent sentence of one year for that conviction.  In this appeal, the Defendant argues that the trial court erred by denying his pretrial motions to suppress the evidence recovered from a search of his apartment and his confession because he lacked the intellectual capacity to validly consent to the search or effectively waive the rights guaranteed him by Miranda v. Arizona, 384 U.S. 436, 479 (1966).  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;**
**Remanded for Correction of Clerical Error**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

William D. Massey, Lorna S. McClusky (on appeal); Mary K. Kent and Larry Nance (at trial); Assistant Public Defenders, Memphis, Tennessee, for the appellant, Derrick Settles.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dean Decandia, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Jamie Crawford and Shawn Williams were both shot in the head at close range and killed during the early morning hours of December 5, 2002, in Memphis. Four days later, the Shelby County Sheriff's Department discovered the murder weapon and thirteen small bags of marijuana in the nineteen-year-old Defendant's apartment. After the Defendant was arrested, he gave a statement admitting that he had killed both victims. A grand jury indicted him for two counts of first degree murder and two counts of possession of marijuana with the intent to sell or deliver. Subsequently, the Defendant filed pretrial motions to suppress both the evidence recovered from his apartment and the inculpatory statement he gave to police, arguing that he did not validly consent to the search or effectively waive his <u>Miranda</u> rights. The trial court denied these motions,[1] and the Defendant elected to have a jury trial.

**State's Evidence**

Officer Louie Hall of the Shelby County Sheriff's Department testified that he received a call at approximately 4:35 a.m. on December 5, 2002, regarding two suspicious people sitting in a vehicle located at 5301 Farm View Drive in Memphis. When he and his partner arrived at that location, they found a maroon, "older model Cadillac" sitting stationary with the engine running and the headlights on, and they observed two people (one male, one female) in the front seats who they initially thought were sleeping. When Officer Hall rapped on the driver's-side window, they did not stir. The female was in the driver's seat, and the male was in the passenger's seat. When Officer Hall opened the driver's-side door, the female occupant's arm fell out. He felt for a pulse, and there was none. He saw blood coming out of their noses, so he called for an ambulance before securing the scene. When the emergency medical technicians arrived, they confirmed that the car's occupants were dead.

Officer Hall spoke with the resident of 5301 Farm View Drive. The resident had woken up to hear a car running outside. After going out to the car, seeing blood, and being unable to wake up the car's occupants, the resident called the sheriff's department. On cross-examination, Officer Hall testified that the car was parked in front of the only house on Farm View Drive and confirmed that it was "out in the country" in the Reagan Farm subdivision. Officer Hall turned off the headlights and the engine but did not touch anything else inside the car. The two victims were later identified as Shawn Williams and Jamie Crawford.

Mrs. Dollann Williams testified that Shawn Williams was her son and that he was twenty-four years old when he died. Mrs. Amy Finnie testified that Jamie Crawford was her daughter, and that she was nineteen years old when she died. According to Mrs. Finnie, the victims were dating each other at the time they were killed.

---

[1] The trial court held several pretrial evidentiary hearings during which expert testimony regarding the Defendant's intellectual capacity was presented on the issue of whether he consented to the search of his apartment or effectively waived his <u>Miranda</u> rights. This evidence and the trial court's rulings are detailed in the analysis section of this opinion.

Forensic pathologist Dr. Teresa Campbell, testifying as an expert, stated that she conducted autopsies on both victims. Shawn Williams had three gunshot wounds that were all inflicted at a very close range, and Dr. Campbell determined that his death was caused by "[m]ultiple contact and near gunshot wounds to the head and neck." Jamie Crawford died from a single gunshot wound to the back of her head. Toxicology reports indicated that neither victim had drugs or alcohol in their system. Dr. Campbell recovered all four bullets from the victims.

Paulette Sutton, the Director of Investigations for the Memphis Medical Examiner's Office, testified as an expert in bloodstain pattern analysis. She examined the interior of the car in which the victims were found and concluded that the bloodstain pattern on the backseat and rear windows was consistent with someone shooting the victims from the driver's side of the backseat while leaning forward toward the center of the car.

Lieutenant John Mills, a detective with the homicide division of the Shelby County Sheriff's Department, testified that he arrived at the crime scene after the victims were pronounced dead by medical personnel. He described how the victims appeared when he arrived:

> [I]f you [were] just looking at them, you'd think they both were asleep. Both their heads were tilted to the left in a relaxed position. The car was in park. The male on the right, his arm was on the console, his other arm was in his lap, and his feet were crossed.

However, they were bleeding from their mouths, noses and the backs of their heads.

After the bodies were identified and removed, the vehicle in which they were discovered was delivered to a crime-scene laboratory for forensic processing. Bloodstain analysis was conducted, but no identifiable fingerprints were recovered from the car. Also, the blood in the car was analyzed and determined to have come only from the two victims.

Lieutenant Mills interviewed the victims' families in an attempt to "get some leads." After talking with an ex-girlfriend of Shawn Williams, he learned that the Defendant was friends with Mr. Williams and decided to interview him "[t]o follow-up, to get him to point us in a direction so we could close—get the loop smaller of who was with these two people that night." At that time, the Defendant was not a suspect but was considered a potential witness.

Lieutenant Mills and another detective, Sergeant Raymond Sides, as well as some uniformed officers from the Memphis Police Department's Metropolitan Gang Unit, went to the Defendant's apartment. On the way there, Lieutenant Mills discovered that an unrelated warrant had previously been issued for the Defendant's arrest for aggravated burglary. On arrival, they showed a picture of the Defendant to the apartment complex's maintenance man and a neighbor to confirm that the Defendant lived in apartment number seven. When they knocked on the apartment's door, there was no answer, but "one of the officers with [Lieutenant Mills] said that a male just looked out the side

window curtain and closed it." At that point, the maintenance man gave them a key to the apartment because he was worried the policemen would "kick the door in."

They used the key to enter the apartment, and one of the uniformed officers found the Defendant hiding in a closet. The Defendant then consented to a search of his apartment, and "a silver .357 Smith and Wesson" magnum revolver, "a black automatic pistol, and 13 bags of a leafy green substance" were discovered under the bathroom sink inside a space within the wall that had been "kicked out." In addition, a box of "baggies" and a scale were found on a table in the bedroom, and there were two boxes of ammunition[2] on a shelf in the closet. The Smith and Wesson revolver held six bullets, but when it was discovered it contained only two live rounds. Four cellular telephones were also recovered from the apartment.

Lieutenant Mills testified that in his eighteen years of experience working in the "patrol division," he learned that people who sell drugs "use scales to get the correct amount [of drugs] in each bag, they use baggies, and seal them up and tie a knot in them." He opined that the thirteen sealed bags discovered in the Defendant's apartment "were basically the same size" as bags of drugs normally prepared for sale and said that they were all "almost exactly" the same weight.

Officer Murray Wilson of the Memphis Police Department testified that in the evidence room of the Memphis police station, he tested the "green leafy substance" recovered from the Defendant's apartment and confirmed that it was marijuana. In addition, Erica Moody Katherine, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in controlled substance identification. Ms. Katherine examined the thirteen bags of "a green leafy substance" recovered from the Defendant's apartment and concluded that they contained 20.6 grams of marijuana.

Lieutenant Mills further testified that after the search, he took the Defendant to the police station "for processing and to talk to him." As they walked out of the Defendant's apartment, his girlfriend, Kayla Cunningham, approached them and then agreed to also go "downtown" and give a statement. Lieutenant Mills took Ms. Cunningham's statement first, and she indicated that the Defendant was responsible for the murders of Shawn Williams and Jamie Crawford.

Lieutenant Mills testified that they asked the Defendant some preliminary questions regarding his educational background, marital status, and whether he wore glasses and that they then read the Defendant his Miranda rights and explained them to him before he agreed to give a statement. The Defendant signed a waiver of his Miranda rights before answering questions concerning the murders. According to Lieutenant Mills, the Defendant was "calm" and "collected"; he did not appear to be intoxicated and did not have the odor of burnt marijuana on him.

---

[2] The ammunition found in the closet was not the same caliber as either handgun recovered from the apartment.

An audiocassette tape recording of the Defendant's statement was then accepted into evidence and played aloud. Copies of a fifty-nine-page transcript of the Defendant's statement were also passed out to the jurors so they could read along.

In the Defendant's statement, he said that he received "disability" payments but supplemented his income by selling drugs. Specifically, he said that he dealt marijuana but did not sell "crack" and that by doing so, he made "a little extra . . . a hundred dollars here, a hundred dollars there."

The Defendant also said in his recorded statement that Shawn Williams and Jamie Crawford came over to his house at approximately 7:30 p.m. on December 4, 2002. At first, the three of them smoked marijuana and "just killed some time." However, "around" 11:30 p.m. or 12:30 a.m., the Defendant, who did not own a car, offered Mr. Williams twenty dollars to drive him to an unspecified location so that he could sell a "SKS" assault rifle.[3] Mr. Williams reluctantly agreed to go with the Defendant to sell the gun, but Ms. Crawford drove his car because Mr. Williams was "high" and "sleepy."

The Defendant explained in his statement that as they drove, he attempted to contact his buyer on the telephone but said that the individual was "bullshitting" by not answering the telephone even though he was home; so they drove to his house anyway. They arrived at the house and, despite the fact that there were not any lights on, the Defendant decided to get out of the car and "check and see who [was] in the house." He explained that he had a .357 Smith and Wesson pistol in his pocket and that Mr. Williams was also armed with a "long, black" pistol that resembled a "Desert Eagle." In his statement, the Defendant described what happened after he exited the car:

A:    I got to the house. I said I was talking to myself I am going to knock on the door [sic]. I got out of the car. I was walking towards door [sic]. As I was walked [sic] to the door I was never going fast. I was trying to listen [to] them to park the car. Because I had the loaded [rifle] in the car . . . .

Q:    Did you take it up to the door up [sic] with you?

A:    Naw. The only thing I took to the door with me was my pistol and my handcuffs because I didn't [. . . .]

Q:    Ok. You left the [rifle] in the car?

A:    Yeah in the car.

_____

[3] According to the Defendant's statement, he purchased the rifle earlier that evening from an individual whose name he could not recall for $80 and planned to sell it for $150 or more. To garner the profit, he obtained bullets for the rifle and loaded it because he knew he could sell it for more money if it was loaded.

Q:      Where?

A:      In the backseat with them.

Q:      You left it loaded in the backseat?

A:      Yeah.

Q:      You are . . . you are walking up to the front door?

A:      Yeah.  And the whole time I constantly [sic] looking back because I am trying to listen to see if they going [sic] to park.  So I go to the door.  I knock on the door two times real quick because it like they fixing back out of the driveway on me [sic].  So I knocked on the door real quick two times and ran back to the car and said, "Man, (inaudible)."  [Mr. Williams] put the pistol on me and grabbed the [rifle].

Q:      Alright.

A:      By that time, I knocked the [rifle] out of the way and just shot him real quick.

        . . . .

Q:      Alright.  Where did you shoot him at [sic]?

A:      In the head.

Q:      And what did he do then?

A:      He died.  He was dead.

        . . . .

A.      . . . I shot him in the back of the head like wow . . . wow . . . real quick.

Q:      Just two times?

A:      Yea.  Two times.

Q:      Now.  What about the driver girl, Jamie?  What was she doing?

A:      I shot both of them.  I didn't take a chance.

Q: You think she had a weapon?

A: Naw but I knew they was in it together [sic] they were going around setting people's up for about a couple of months now. Just going around setting people up.

On the audiotape recording, the Defendant further stated that he had "jumped back in" the car on the driver's side and was "pretty much" behind the driver's seat when he shot the victims. After the shootings, he took Mr. Williams's pistol and the assault rifle and ran. He stashed those weapons "by some woods" but came back later the same night to retrieve them. He threw the shell casings from the four spent bullets in a ditch "[b]ecause [he] was scared and [he] already knew it was evidence." The next day, the Defendant sold the rifle for $150 and Mr. Williams' pistol for $200, but he did not know to whom he sold them. He also stated that he told Ms. Cunningham the day after the killings that he was "real spooked" because he had "shot two people."

Regarding the location where the shooting occurred, the Defendant stated that he was "not even for sure" which house the supposed buyer lived in but that he only followed directions provided by an unknown person. He stated that he "[n]ever knew who lived there."

Thomas Sesson testified that he lived at 6288 Farm Hill Drive, next to 5301 Farm View Drive where the victims were found dead. On December 5, 2002, he was driving home from work at his usual time, approximately 1:10 a.m., when he saw a "burgundy Cadillac" sitting in the driveway of 5301 Farm View Drive "with the lights on bright." The car was parked, but he did not notice whether anyone was in the car. Later, he learned from a neighbor that the car's two occupants had been shot and killed.

Sergeant Raymond Sides, also a detective with the Shelby County Sheriff's Department, testified that he delivered the handguns discovered in the Defendant's apartment and the bullets recovered from the victims' bodies to the Tennessee Bureau of Investigation. Steve Scott, a special agent forensic scientist with the Tennessee Bureau of Investigation's Firearms Identification Unit, testified as an expert in firearms identification, and he stated that he was able to match bullets recovered from the victims' bodies to the .357 caliber Smith and Wesson magnum revolver recovered from the Defendant's apartment. He detailed the microscopic-comparison process utilized to determine whether a certain bullet was fired from a specific gun and stated that, based on his testing, at least one bullet recovered from each victim in this case "had been fired through the barrel of [the Smith and Wesson revolver taken from the Defendant's apartment] and no other revolver in the world."

**Defense Proof**

Christin Lee testified that he was the Defendant's friend and had known him for eleven years. He stated that on December 4, 2002, he arrived at the Defendant's apartment with another friend, Michael Jones, at approximately 5:30 p.m. and did not leave until approximately 2:00 a.m. the following morning. Mr. Lee testified that the Defendant's brother, Gary, "and a girl named Star and

a dude named Tyron" were all at the Defendant's apartment that night with the victims. Mr. Lee explained that this group "was all over at [the Defendant's] house sitting down playing, playing video games, playing beats—playing beats on the drum machine. We was [sic] just sitting around drinking and having fun. Then we stayed there the rest of the night after everybody had left."

Further, Mr. Lee testified that the victims left the gathering after a "guy named Bear" but that he did not recall at what time that was. According to Mr. Lee, the Defendant's mother came by the apartment that night and was upset that the Defendant was having the gathering because "she had just paid the rent." However, he and the Defendant, along with Michael Jones, stayed at the apartment until they went to a Krystal restaurant at approximately 2:00 a.m. and ate "for a minute." Mr. Lee stated that Mr. Jones and the Defendant dropped him off at his house after they ate at Krystal.

On cross-examination, Mr. Lee admitted that he had visited the Defendant in jail "a lot," and they had discussed the fact that Mr. Lee would testify for him at his trial. He also confirmed that he had never before approached the police or the district attorney's office with information about the Defendant's alibi even though the Defendant had been in jail awaiting trial for over three years.

Michael Jones testified that he had known the Defendant since 1998 when they were in high school together. Mr. Jones stated that he was at the Defendant's apartment on the evening of December 4, 2002. He said that the victims were there, as well as "Gary, Star, some other girl, and Bear" and that they were all "[p]laying video games and rapping and drinking beer." Mr. Jones did not know Mr. Williams but learned his name that night. According to Mr. Jones, the victims left the apartment with Gary and Star after the Defendant's mother "came by," but he and Mr. Lee stayed until 2:00 a.m. when the three of them went to Krystal. After eating, he drove Mr. Lee home and then took the Defendant back to his apartment at approximately 3:00 a.m.

Mr. Jones also confirmed that, even though he had information about the Defendant's alibi, he did not approach anyone other than the victim's mother about it until "probably about" one week before his trial. He admitted on cross-examination that he had visited the Defendant in jail but denied that they ever discussed his case. He did say however that he had discussed the case with Mr. Lee "somewhat."

The Defendant did not testify, and after deliberating, the jury convicted him on all counts.

### Sentencing

Subsequently, an initial sentencing hearing was held in order for the jury to receive evidence on whether certain aggravating factors were present during the Defendant's murder of Jamie Crawford. After the hearing and further deliberation, the jury unanimously found that the State had proven beyond a reasonable doubt that the Defendant's murder of Jamie Crawford (count two of his indictment) was knowingly committed while the Defendant had a substantial role in committing a first degree murder. See Tenn. Code Ann. § 39-13-204(h)(i)(7). Consequently, the jury fixed his

punishment for the murder of Jamie Crawford at imprisonment for life without the possibility of parole.

An additional sentencing hearing was held in order for the trial court to impose sentence on his remaining convictions. At the close of this hearing, the trial court imposed a life sentence for the murder of Shawn Williams (count one of his indictment) and ordered that it be served consecutively to the life without the possibility of parole sentence because the Defendant had distinct motives for killing each victim. The trial court also merged the two possession convictions (counts three and four) into a single offense and ordered a one-year sentence to be served as a Range I, standard offender,[4] and concurrently with the life without the possibility of parole sentence.

The Defendant's motion for a new trial was denied, and he filed a timely notice of appeal.

**Analysis**

On appeal, the Defendant raises two interrelated arguments. Essentially, he avers that he did not have the intellectual capacity to effectively consent to the search of his apartment or validly waive his Miranda rights. Accordingly, he posits that the trial court erred by denying his pretrial motions to suppress the evidence recovered from his apartment (i.e., the murder weapon and the marijuana) and his confession. In making these arguments, the Defendant relies on evidence presented at a series of pretrial hearings,[5] including expert testimony regarding the Defendant's cognitive abilities. After reviewing the evidence presented at the pretrial hearings, we will address each argument in turn.

At the pretrial hearings, clinical psychologist Dr. Joseph Charles Angelillo, an expert for the defense, testified that he met with the Defendant four times prior to appearing in court. He also reviewed the Defendant's mental-health history, which included the results of prior intelligence tests the Defendant took when he was a public school student.

Dr. Angelillo stated that, based on the Defendant's records, when he was ten years old his "full scale" intelligence quotient ("IQ") was sixty-seven, and based on an "achievement test," he was functioning at a first grade level in both reading and writing skills. According to an adaptive functioning test administered by his foster mother at about the same age, his communication, daily living and socialization skills were all "below the .1st percentile," meaning that approximately

---

[4] Discussion between the trial court and counsel at the latter sentencing hearing showed that the Defendant actually met the criteria to be sentenced as a Range II, multiple offender, but as no evidence or argument was presented to establish the fact, he was sentenced as a Range I, standard offender for the possession offense.

[5] Specifically, the trial court held three pretrial hearings. The first was styled as a motion for competency and was held on April 15, 2005. The second was held on February 2, 2006, on the defense's motion to prevent the State from seeking the death penalty. The final pretrial hearing, held on February 10, 2006, was the official hearing on the Defendant's motions to suppress the evidence recovered from his apartment and his confession. However, the argument and testimony presented at all three hearings directly addressed the suppression issues. As such, the evidence presented at all three hearings is collectively summarized.

99.5% of people the same age would score higher than he did. At that time, "he was diagnosed with mild mental retardation according to Tennessee eligibility requirements." His intelligence was tested again the same year, and his full scale IQ was recorded on that occasion as seventy-two.

When the Defendant was fourteen years old, results of an intelligence test showed his full scale IQ to be eighty-three, but in July of the same year, he scored a full scale IQ of fifty. At that time, the doctor administering the test noted that the Defendant was not motivated but did not indicate that the Defendant was malingering in order to intentionally score low. Dr. Angelillo testified that the test results noted that his "psycho-social interactions appear to be significantly impaired at present. [His] level of insight and judgment appears to be impaired, and it's likely he could have difficulty setting realistic goals and making significant decision[s] independent of others."

The Defendant was again tested in March of 2002. Those test results showed his full scale IQ to be seventy-two, and he was also "found to have generalized learning disorder and significant symptoms of depression." At some point, he was prescribed medication for his depression.

Prior to the pretrial hearings, in August of 2004, Dr. Angelillo himself administered a Wechsler Adult Intelligence Scale test (IQ test) to the Defendant, and he scored a full scale IQ of fifty-three. Dr. Angelillo said the Defendant was depressed but was not certain whether the Defendant was on his medications at the time he administered the test. Dr. Angelillo affirmed that the low score could be attributed in part to depression and a lack of motivation. He also explained that, although he believed the Defendant had potential to score higher, he did not think the score was inaccurate.

Dr. Angelillo informed that, for legal purposes, there are three requirements for a person to be diagnosed as mentally retarded: (1) the person must score below seventy on a Wechsler Adult Intelligence Scale test; (2) the person must be deficient in at least two areas of "adaptive functioning"; and (3) the mental retardation must manifest before the person is eighteen.[6] According to Dr. Angelillo, the Defendant met the legal criteria for mental retardation. As relates to the death penalty however, this issue became moot when the State withdrew their stated intention to seek the death penalty, choosing instead to seek a punishment of life without the possibility of parole. Dr. Angelillo also administered the MacAuthur Competency Scale test to the Defendant, which informs whether a defendant is competent to stand trial, and found the Defendant competent to stand trial.

Speaking generally about mild mental retardation, Dr. Angelillo stated that mildly mentally retarded people understand that they are different from "normal" people and that they "try to hide the fact that they are different" by acquiescing or agreeing. He said they "look for cues from people as to what it is they think that they want them to say. They try to please."

_____

[6] See Tenn. Code Ann. § 39-13-203(a) (setting out this three-pronged criteria for exemption from the death penalty due to mental retardation).

Asked whether the Defendant could understand his <u>Miranda</u> rights if someone read them to him, Dr. Angelillo explained that he would have "severe problems" in understanding them because

> he has the ability to very, very basically summarize individual sentences from <u>Miranda</u>. He does not have close to the ability it takes to make meaning of the whole, the <u>Miranda</u> rights, the <u>Miranda</u> warning in its entirety. That entails a bit of abstracting ability that is to connect one idea to the another [sic] to be able to engage in "what if" type of thinking to be able to go beyond the concrete, and he would have, as he has shown in the past and continues to, severe difficulty in doing that.

Defense counsel and Dr. Angelillo also had the following exchange regarding the Defendant's ability to understand his <u>Miranda</u> rights:

> DEFENSE COUNSEL: Given your examination of [the Defendant], the testing, the prior testing that has been done, can you give us an opinion as to whether or not he truly understood his <u>Miranda</u> rights and the waiver of them?
>
> DR. ANGELILLO: I'll answer the question I think you're saying okay because there's no way of knowing for me or for anybody in this [c]ourt did he understand them at that time. There's no way we can do that, but let me—second thing is I'm not—I do not believe that [the Defendant] thinks that he agreed to anything.
>
> Now, aside from that, research does back some of things [sic] I'm saying. I'm not saying because I think so. I do review the research that [mentally retarded] people do acquiesce and that it is a tendency for people who have lower IQs to hide that they're maybe not as bright as others.
>
> The other thing I might mention is, is research is that <u>Miranda</u> is written on about a seventh grade level of comprehension and writing and reading comprehension as well. So conclusion to the question I think you might asking [sic], he would have great difficulty, and those are the things that would stand in the way of good understanding.

Upon questioning by the trial court, Dr. Angelillo stated that the Defendant's "intellectual potential in my opinion is likely higher than his current IQ scores," and explained that the reason could be that he had been out of school for some time and was not "engaging in intellectually stimulating activities," which would promote lower IQ scores. Dr. Angelillo also agreed that the

Defendant was not motivated but did not find that he was malingering, or intentionally trying to secure a low score.

Dr. John Robert Hutson, also a clinical psychologist, testifying as an expert for the State, stated that he evaluated the Defendant on two occasions in order to form an opinion on whether the Defendant was competent to stand trial (he determined that he was) and whether an insanity defense could be supported (he determined that it could not). Dr. Hutson described the Defendant as a "functioning illiterate," meaning that he could function from day to day but could not adequately read or write on his own.

Although he had not reviewed the Defendant's records before testifying, he also commented on the dramatic range of scores the Defendant had received on past IQ tests. He stated that it was not unusual for incarcerated people to not put forth their best effort on IQ tests. He also stated that when he initially evaluated the Defendant, at the beginning of their session, the Defendant engaged in active malingering and "attempted to act bizarre" by getting "on the floor and act[ing] like he did not know anything, but when confronted, [the Defendant] became more cooperative and information was obtained from him."

Dr. Hutson found that the Defendant did not meet the definition for mental retardation and explained as follows:

> In the information I got from him, he indicated he used—well, he indicated that under his occupation that he sold drugs and that he had been a scanner. I don't recall what a scanner was whether that meant he was like a check-out person and scanned items through a scanning machine or whether he used an inventory scanner, but actually I think he did work for somebody where he used some sort of electronic scanning device.
> He also used words despite being essentially illiterate. Although he went to the eleventh grade when he was expelled, he used words such as he indicated he had been convicted of aggravated—a burglary in the past that he got three years probation. He was actually proud of the fact that he had almost completed that probation at the time I saw him in 2002.
> He used words like—he did not know what medications he was taking at the time I saw him, but he indicated he was taking them for depression, for sleep and he was taking a mood stabilizer. Now, stabilizer is a pretty sophisticated word, if you will. He also indicated his medical history that he had [an] injury to his testicles. That's not a word you commonly get from a retarded individual. That's just some examples why I did not think he was retarded.

At a subsequent hearing, the Defendant took the stand. The State's withdrawal of their intention to seek the death penalty was conditional on the Defendant's assent to their late filing of a notice that they would seek a penalty of life without the possibility of parole and their late filing of a notice that they intended to impeach the Defendant with his prior convictions if he chose to

-12-

testify. The Defendant was voir dired by his own attorney and testified that he understood these terms of the State's withdrawal of their intention to seek the death penalty and that he agreed to them.

Mrs. Louise Love testified that the Defendant was her son. When the Defendant was six years old, she was told that he had learning disabilities. Until then, she "never thought anything was wrong with him." He was in "special classes" when he was in school, but when he left school, he was not able to read. He could not hold down a job because of his inability to "understand things." He received disability payments from the Social Security Administration because he was mentally retarded. He previously had a job cleaning at a Wendy's restaurant, but he was not able to hold the job.

Mrs. Love informed that her husband was responsible for paying the rent and utilities at the apartment in which the Defendant lived. She testified that her husband lived there with the Defendant and that she lived at another location, but came by the apartment often. Mrs. Love supported the Defendant by providing him with money, food, clothing and a place to live.

Lieutenant Mills testified at the hearing on the motion to suppress and described how he first arrived at the Defendant's apartment. His testimony on that point at the hearing was substantially the same as his testimony on that issue at trial. However, he did provide more details about the Defendant's consent to the search. Lieutenant Mills testified that after the Defendant was discovered hiding in a closet, he told Lieutenant Mills that he was aware that there was a warrant out for his arrest. However, when Lieutenant Mills told the Defendant that he "wanted to talk to him about something else[,]" the Defendant "indicated he knew what that was."

Lieutenant Mills also testified that the Defendant agreed to allow the officers to search his apartment by signing two separate consent to search forms. He said that an officer explained the first consent to search form to the Defendant and that he appeared to understand it. Lieutenant Mills explained how they used the form and why the Defendant agreed to it:

> Well, we explained to him and read to him and told him what we wanted to do and he agreed to it. And we just put it in layman's terms that we were looking for other items of evidence. And that if he didn't want to sign, that's fine too. We would secure the apartment and go to a judge and get a search warrant and come back and search it. And he just said "I'll sign it." So he went ahead and signed it.

The Defendant was "normal" and responsive when the officers asked him questions. They also explained the second consent form to him and "there were no questions and he signed it." In addition, Lieutenant Mills testified that the form is "very simple," saying that it is only "three or four sentences." The Defendant did not ask any questions or indicate that he did not understand.

Lieutenant Mills stated that the first consent to search form was the Metropolitan Gang Unit's form and that the second form was the one normally used in the homicide division. Asked why he utilized both forms to search the Defendant's apartment, he explained that:

> When we do things in the homicide division I like to keep our paperwork and the gang squad has their own type of paperwork. And even though it's the same form, I just like to keep my forms. Everything I do I like to keep them and the way I normally do them.

The apartment was "very small," consisting of a living room, a kitchen, one bathroom and one bedroom. While he was inside the Defendant's apartment, Lieutenant Mills did not smell "the odor of burnt marijuana" nor did he find any "roaches or burnt papers." However, the search did reveal the murder weapon, another handgun, marijuana, scales, "baggies," and other evidence.

Lieutenant Mills testified that the consent to search forms were signed by the Defendant a "short period" of time after he was discovered in the closet. He testified that "[a]fter everything was secured," and they were sure no one else was in the apartment, they began discussing the consent to search forms in the living room.

Lieutenant Mills also testified regarding the Defendant's waiver of his Miranda rights. After the search, Lieutenant Mills took the Defendant and Ms. Cunningham to the police station, and he took Ms. Cunningham's statement first. Prior to taking the Defendant's statement, the Defendant was advised of his rights. The Defendant also signed a form indicating that he had been advised of his Miranda rights, and Lieutenant Mills testified that he read the form to him before he signed it. According to Lieutenant Mills, the Defendant appeared to understand his Miranda rights. He also did not appear to be "high or otherwise intoxicated." Lieutenant Mills testified that no promises or threats were made to the Defendant in exchange for his statement and that he did not at any point refuse to answer questions or request that a lawyer be present.

Lieutenant Mills testified that they asked the Defendant "general questions" unrelated to their investigation prior to "Mirandizing" him. Once the audiotape recording began, they read the Defendant his rights one time, and he "had a copy," which he read as the rights were stated to him. Lieutenant Mills said they did not further explain the rights to him because he did not ask any questions, but rather, when he was asked if he understood his rights, he indicated that he did understand them. They asked the Defendant if he wanted the rights re-read, and he answered, "No."

He responded "normally" and answered questions "immediately" after they were asked. Initially, Lieutenant Mills asked if the Defendant knew Shawn Williams, and "he went into a very long statement on what happened that night." Even when the detectives were not asking questions, the Defendant would "continue to talk on his own."

Kayla Cunningham testified for the defense at the suppression hearing that she and the Defendant had been smoking marijuana approximately thirty minutes before the police arrived and

arrested him. On cross-examination, she confirmed that she had visited the Defendant in jail "many times" but denied that he had threatened to kill her if she "told anybody what he admitted to [her]." Ms. Cunningham also testified that the Defendant threatened her with a gun the night before he was arrested because she refused to go with him to an exotic dance club.

After hearing argument, the trial court ruled that the Defendant was competent to stand trial and that his inculpatory statement was admissible at trial:

> The [c]ourt feels that this [D]efendant was mentally capable of taking care of himself. He was illiterate. He had a low IQ and all of that, but the [c]ourt has to note that he was in a [sic] business apparently of selling dope. He had his own business. He had guns and a girlfriend and worked a couple of places one time. Why he lost his job, I don't know. But he couldn't read very good [sic] at all so that limited his employment. So of course that [doesn't]—that goes to his intelligence in regard to understanding the written language.
>
> The [c]ourt as to his—the [D]efendant's statement on arrest, the [c]ourt finds that this [D]efendant did understand his rights. They were read to him and explained to him. And listening to the [D]efendant on the stand, the [c]ourt feels that he, in fact, he kind of stopped me on something [that] he may not have understood and that [defense counsel] was talking [to him] about, and so she reexplained it to him. And so he had knowledge to blurt out things that he didn't understand and ask about them. And the [c]ourt feels that he did understand his rights that were read to him and explained to him at the time.
>
> And I don't find that this statement was involuntarily given or he was pressured to give this statement or I find that freely and voluntarily given by this [D]efendant. And the [c]ourt feels that it is admissible in this case and will rule so.

The trial court further ruled that the Defendant validly consented to the search of his apartment: "I found no defect in the [Defendant's consent] when I heard that testimony. I've heard nothing to the contrary. So [the] consent to search will stand as being valid in this matter."

**Standard of Review**

In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our supreme court set out the standard of review this Court uses in reviewing a trial court's ruling on a motion to suppress evidence:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall

be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23; see also State v. Dych, 227 S.W.3d 21, 37 (Tenn. Crim. App. 2006). However, we review the trial court's application of the law to the facts de novo, without affording legal conclusions a presumption of correctness. Dych, 227 S.W.3d at 37 (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)); see also State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## I.      Validity of the Defendant's consent to search

The Defendant contends that the trial court erred by admitting the evidence recovered during the search of his apartment because his consent for the search was ineffective. The Defendant contends that Lieutenant Mills's testimony indicates that he did not explain the consent to search forms to the Defendant and that Dr. Angelillo's testimony establishes that the Defendant was not capable of reading and understanding the forms himself. Essentially, the Defendant claims that, in light of the whole record, and taking into account the Defendant's possibly vulnerable subjective state of mind, he did not "possess sufficient education, intelligence, knowledge or maturity to have made a 'free and unconstrained choice' in the matter of his consent to the search of his apartment." (quoting State v. Cox, 171 S.W.3d 174, 184–85 (Tenn. 2005)).

A warrantless search conducted by state officials is presumed to be unreasonable under the Fourth Amendment to the United States Constitution as well as Article I, section 7 of the Tennessee Constitution,[7] and the resulting evidence is subject to suppression unless the State demonstrates that the search was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. See Cox, 171 S.W.3d at 179. One well-established exception to the warrant requirement exists when the subject of the search consents to it. Id. (citing State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996)).

Whether an individual's consent to a search was voluntary and within constitutional boundaries "is a question of fact to be determined from the totality of the circumstances." State v. Scarborough, 201 S.W.3d 607, 623 (Tenn. 2006) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)) (other citation omitted). To "pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992) (citing Liming v. State, 417 S.W.2d 769, 770 (Tenn. 1967)); see also State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998). However, it is not necessary

---

[7] Our constitution states:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not be granted.

Tenn. Const. art. I, § 7.

-16-

that the officer inform the subject of his right to refuse consent. State v. Vaughn, 144 S.W.3d 391, 403 (Tenn. Crim. App. 2003) (citing United States v. Drayton, 536 U.S. 194, 206 (2002)). Given the totality of the circumstances standard, whether consent is voluntary and effective is fact specific to each case. See Cox, 171 S.W.3d at 185. The heart of the inquiry is "whether the defendant's act of consenting is the product of an essentially free and unconstrained choice. If the defendant's will was overborne and his or her capacity for self-determination critically impaired," the constitution is offended. Id. (citing Schneckloth, 412 U.S. at 225–26).

Factors that may be evaluated include: (1) the time and place of the encounter between the subject and authorities; (2) whether the encounter was in a secluded or public place; (3) the number of police officers present; (4) the degree of hostility; (5) whether weapons were displayed; (6) whether consent was requested; and (7) whether the subject initiated contact with the police. Id. This Court "may also consider the individual's personal characteristics, including his or her age, education, intelligence, knowledge, maturity, sophistication, experience, and prior contact with law enforcement personnel." Scarborough, 201 S.W.3d at 623. Another appropriate factor to consider is a defendant's "knowledge of his or her right to refuse consent." Id.

In consideration of these and other factors, we conclude that the trial court did not err in finding that the Defendant voluntarily and effectively consented to the search of his apartment. The encounter between the policemen and the nineteen-year-old Defendant occurred in his own apartment near midday. There is no indication in the record that the number of officers present was inordinate or intimidating. Likewise, the record does not demonstrate that there was any hostility at all between the policemen and the Defendant or that weapons were displayed; rather, the record demonstrates that the Defendant was cooperative from the start. The police did initiate contact and request the Defendant's consent, but the record reflects that he gave it without hesitation (and with knowledge that he had the right to refuse) by signing two separate forms. In addition, the Defendant has a record of prior arrests and therefore has some experience interacting with law enforcement personnel.

We have also considered the expert testimony presented by the Defendant at pretrial hearings regarding his limited intellectual capacity, and it appears from this evidence that the Defendant is not a particularly intelligent, sophisticated or mature individual. However, the testimony presented by Dr. Angelillo did not conclusively establish that the Defendant was actually mentally retarded and therefore unable to effectively consent to a search of his apartment. The trial court observed the Defendant and heard him testify in open court, and the trial judge based his findings in part on his personal observations of the Defendant. The Defendant's intelligence is only one factor among many that a Court considers when evaluating the validity of a consent to a search. In consideration of the totality of the circumstances, we conclude that the trial court did not err in overruling the Defendant's motion to suppress the evidence recovered from his apartment.

## II. Efficacy of the Defendant's waiver of Miranda rights.

The Defendant also argues that the trial court erred in ruling that the Defendant voluntarily and intelligently waived his Miranda rights. The Defendant stresses that Dr. Angelillo testified that

the Defendant would not be able to understand the Miranda rights if they were read to him as a whole and that the rights would have to be broken down individually for him to comprehend them. The Defendant also points to Dr. Angelillo's testimony that mentally retarded people acquiesce and agree, looking for cues from people and saying "what it is they think that they want them to say." He notes that the State's expert, Dr. Hutson, admitted that the Defendant was a "functioning illiterate," and that the trial court also recognized the Defendant's limited ability to read and write. In sum, the Defendant asserts that the evidence weighs against the trial court's finding, and contends that, "based on the totality of the evidence presented below, that the [D]efendant did not understand his rights."

A criminal defendant's "right against compelled self-incrimination is protected by both the federal and state constitutions."[8] State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)). Accordingly, pursuant to the United States Supreme Court's holding in Miranda v. Arizona, 384 U.S. 436 (1966), statements made by a defendant during custodial interrogation are not admissible at trial unless the defendant was first "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. at 444. After being notified of these rights, a defendant may waive them, "provided the waiver is made voluntarily, knowingly, and intelligently." Id. As our supreme court has explained:

> The relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Stephenson, 878 S.W.2d at 544–45.

As with the validity of consent to search, in order to determine whether a defendant effectively waived his Miranda rights, Tennessee courts look to the totality of the circumstances. See Blackstock, 19 S.W.3d at 208. A defendant's mental impairment or retardation is one factor that can be considered. See id. (commenting on a number of cases from various jurisdictions where the defendant's intelligence was central to the court's inquiry regarding the validity of a waiver of Miranda rights.) The defendant's cognitive abilities, however, must be considered along with a host of other possible factors:

---

[8] Article I, section 9 of the Constitution of the State of Tennessee provides:
That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and in prosecutions by indictment or presentment, a speedy public trial, by an impartial jury of the county in which the crime shall have been committed, and shall not be compelled to give evidence against himself.

Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained.

Id.

The Defendant was nineteen years old when he gave his statement, and the expert testimony revealed he was not fully literate but did have a limited aptitude for the written language. As the Defendant stresses, Dr. Angelillo did testify that the Defendant would not be able to understand his Miranda rights if they were read to him all at once. However, Dr. Angelillo also testified, that even after his interaction with the Defendant, there was no way anyone could know whether he understood his rights when they were read to him on the day in question. Further, the Defendant's low scores on past IQ tests are contradicted by a score of eighty three, which he made five years before he gave the statement. This highest IQ score included in the Defendant's mental-health history is well above the threshold delineating mental retardation.[9]

The trial court pointed to the Defendant's ability to operate as a drug dealer and obtain other employment as signs that he was not as mentally deficient as the defense suggested. The trial court also noted that, based on observations of the Defendant during a voir dire, the Defendant was able to interject and ask questions when he did not understand something. Lieutenant Mills testified that after reading the Defendant his rights, the Defendant indicated that he did not have any questions and declined to have the rights re-read. Further, his responses to questions were prompt and detailed. He was able to provide a coherent and logical narrative of the chain of events that led to his murder of the victims. As such, we must conclude that, based on the totality of the circumstances, the trial court did not err in ruling that the Defendant knowingly, intelligently, and voluntarily waived his Miranda rights. See State v. Latonya Taylor, No. M2005-00313-CCA-R3-CD, 2006 WL 2206064, at *4 (Tenn. Crim. App., Nashville, July 31, 2006).

In closing, we note a clerical error in the judgment of conviction for first degree murder in count two, for which the Defendant received a sentence of life without parole. The trial court did not check the box indicating that the jury found the Defendant guilty. We remand to the trial court for correction of this error.

**Conclusion**

We conclude that the trial court did not err by finding that the Defendant effectively consented to the search of his apartment and validly waived his Miranda rights, and we affirm the judgments of the trial court. We remand this case for entry of a corrected judgment reflecting a finding of "guilty" in count two for which the Defendant was sentenced to life without parole.

---

[9]The Defendant's expert testified that for a person to be considered mentally retarded, the person must score below seventy on a Wechsler Adult Intelligence Scale test. See also Tenn. Code Ann. § 39-13-203(a)(1).

_____
DAVID H. WELLES, JUDGE