IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 19, 2026 Session

## STATE OF TENNESSEE v. ALFONVO MONTELL JOHNSON a.k.a. ALFONZO MONTELL JOHNSON[1]

**Appeal from the Criminal Court for Bradley County**
**No. 20-CR-456A    Andrew M. Freiberg, Judge**

———————————————————

**No. E2024-01862-CCA-R3-CD**

———————————————————

Defendant, Alfonvo Montell Johnson, appeals his Bradley County Criminal Court jury convictions of facilitation of second degree murder, conspiracy to commit first degree murder, evidence tampering, abuse of a corpse, and attempted abuse of a corpse, arguing that the evidence was insufficient to support certain of his convictions and that the absence of an election with regard to the charge of evidence tampering entitles him to a new trial on that offense.  Because the evidence was insufficient to support Defendant's convictions of abuse of a corpse and attempted abuse of a corpse, we reverse those convictions and dismiss the charges.  We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed and Dismissed in Part**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J, and JILL BARTEE AYERS, J., joined.

William W. Gill, Assistant Public Defender-Appellate Division (on appeal); and Benjamin McGowan and Elizabeth Ciabattone, Chattanooga, Tennessee (at trial), for the appellant, Alfonvo Montell Johnson.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Dallas Scott and Paul Moyle, Assistant District Attorneys General, for the appellee, State of Tennessee.

———————————

[1] The record indicates that the correct spelling of Defendant's first name is "Alfonzo," but, as is the practice of this court, we utilize the spelling of his name as it appears in the indictment.

## OPINION

Defendant's convictions in this case arose from the September 22, 2019 deaths of the victims, James Robert Ledford, Jr., and Jacklyn Kay Markcloud, in Cleveland. Mr. Ledford's body was discovered on September 23, 2019, inside a wooden chest in the back of his pickup truck, which was parked at the Fort Hill Cemetery. Ms. Markcloud's body was discovered two days later lying off the side of McCann Road. Both victims had been shot to death.

### Factual and Procedural Background

In November 2020, a Bradley County grand jury charged Defendant and co-defendant Christopher Roberson, via a six-count indictment with the first degree premeditated murders of Mr. Ledford and Ms. Markcloud, conspiracy to commit first degree murder, evidence tampering, and abuse of each victim's corpse.

At the four-day trial, which began on August 15, 2022, Natasha Smith testified that in September 2019, Roberson was upset because someone had stolen his motorcycle. Roberson came to the home of Ms. Smith's friend, Shonda Perez, who told Roberson that "Pocket" had his motorcycle. Other witnesses testified that "Pocket" was Mr. Ledford's nickname. Ms. Smith went with Roberson, Ms. Perez, and others in two cars to look for Mr. Ledford. Roberson, who was armed with a handgun, stated that when he found Mr. Ledford, he was "gonna beat his a**. He gonna be dead." While looking for Mr. Ledford, the group went to a small house on a hill near "the old Waterville Elementary School," where they encountered Ms. Markcloud, who came outside and threatened to call the police. As they drove around looking for Mr. Ledford, Ms. Smith saw Roberson, who had been traveling in a separate car, "standing outside of the house on High Street with a gun." Ms. Smith's group stopped by a house, and Ms. Perez spoke to Defendant, who did not appear surprised to learn of the search for the motorcycle. She conceded that Defendant was not involved in the search for Mr. Ledford.

Mr. Ledford's sister, Rhonda Lee Crowe, testified that she asked Mr. Ledford, who had been staying with her, to move some of his stuff out of her apartment in Ocoee Village Apartments in September 2019. Defendant came to her home with Ms. Markcloud, and the two placed clothing into a large cedar box, which they then placed into the bed of Mr. Ledford's "little white S-10 truck." They also placed a large, older flat screen television into the truck. Ms. Crowe identified the television later discovered inside Defendant's residence as the same one that Mr. Ledford and Ms. Markcloud put into the truck. Surveillance video taken from a neighboring apartment captured footage of Mr. Ledford driving his truck out of the parking lot at 5:36 a.m. on September 22, 2019. There was a large black object in the bed of the truck.

A video of the preliminary hearing testimony of Malcolm Carter, who died before trial, was entered into evidence and played at trial in lieu of live testimony. Mr. Carter

testified that he lived at 135 High Street in Cleveland with his mother, Velma McKissic, and Defendant, who was his mother's boyfriend.  Mr. Carter testified that Defendant drove a convertible Chrysler Sebring that was "all colors."

Mr. Carter recalled that on September 22, 2019, Roberson came to 135 High Street sometime between midnight and 1:00 a.m. and that Roberson and Defendant discussed Mr. Ledford's theft of Roberson's motorcycle.  Roberson was armed with a 9 millimeter handgun.  After Roberson left sometime between 2:00 and 3:00 a.m., a white man who Mr. Carter did not know knocked at the door.  Defendant told Mr. Carter, "That's Pocket," and Mr. Carter let him in.  Mr. Carter saw a small pick-up parked outside with someone sitting in the passenger seat.  After letting Mr. Ledford inside, Mr. Carter went to his bedroom.  At some point, he heard a gunshot and said he thought the shot had come from the kitchen area, but he did not get up to investigate.

On the following morning, Ms. McKissic told Mr. Carter to "help" Defendant "with the TV," and Mr. Carter saw "a big Mitsubishi TV" that he had never seen at the house before, sitting in the living room.  Mr. Carter observed Defendant cleaning something that looked like blood "at the back door" of the residence.  Mr. Carter said Mr. Ledford's truck was no longer parked outside.  Defendant later told Mr. Carter that "Pocket got killed."  Of the passenger in Mr. Ledford's truck, Defendant said, "The b**** got f***ed up." Defendant told Mr. Carter that her body "was off the road near Tebow's."  Defendant described the offenses to Mr. Carter as "like a movie" and said that he and Roberson had both been involved.

Proof offered by Defendant established that Mr. Carter had prior convictions for criminal simulation and theft and that he had pending charges for aggravated burglary and theft at the time of the preliminary hearing.  Other evidence established that Mr. Carter was under investigation for the disappearance of his wife, Casey, who went missing at the end of 2018.  During an interview in September 2021, Mr. Carter reported that his wife had gone to Atlanta with a Hispanic man.  During a second interview on November 19, 2021, Mr. Carter reported that he had left his wife at a family property in Meigs County when she overdosed on heroin.

Wayne Bookout testified that he discovered Mr. Ledford's truck on September 23, 2019, while walking with his girlfriend in the Fort Hill Cemetery.  Mr. Bookout's girlfriend looked inside the truck and "said something about blood."  His girlfriend opened the wooden box in the bed of the truck, and they saw a body inside.  They reported the discovery to the police.

Bradley County Sheriff's Department forensics division Detective Laura Lane testified that Mr. Ledford's body was found wrapped in a fitted sheet inside a cedar chest in the bed of a truck parked in Fort Hill Cemetery.  She smelled gasoline in the box.  The detective unsuccessfully attempted to collect fingerprints from the box.  Forensic

3

processing of Mr. Ledford's truck revealed the presence of blood in the passenger compartment as well as two shell casings: one in the driver's side front seat and the other on the driver's side floorboard toward the back of the seat. Two bullets were recovered from inside plastic molding beneath the window.

Cleveland Police Department Lieutenant Cody Hinson testified that after Mr. Ledford's body was identified, he learned that Ms. Markcloud may have been with Mr. Ledford and began to look for her. On September 25, 2019, Charles Fuller discovered her body while walking with his girlfriend on McCann Road. Lt. Hinson testified that "there was stuff piled on top of her" body, including "couch cushions," "a flashlight," and "furniture." The appearance of the scene suggested to him that someone was "trying to conceal her . . . under these items." After learning from Ms. Smith about the "group looking for this motorcycle" that they believed Mr. Ledford had taken from Roberson, officers obtained and executed a search warrant at an apartment on Scheeler Street where they believed Roberson to be living and which was approximately 800 yards from the location where Ms. Markcloud's body was discovered. Inside, officers discovered a prescription in Roberson's name along with other items that belonged to him and his children. Outside, officers found the "remnants of what appeared to be burned clothing" in the grass and on a shared balcony at the back of the apartment.

Lt. Hinson testified that the investigation drew their attention to Defendant's residence at 135 High Street, which was located between Scheeler Street and the Fort Hill Cemetery via Inman Street. Inside the residence, officers discovered a large television "that was delivered by Mr. Ledford." They also observed "a bullet hole still with a bullet in it" in the back door of the residence. "Blue Star" application to the back door, back porch, and back porch stairs revealed the presence of blood in those areas as well as the presence of blood spatter "on the front of [a] stove that was on the back porch." In the backyard, officers found "a large filing cabinet in the middle of the yard that was used as a burn pit." They found several items in the burn pit.

Lt. Hinson collected surveillance video from a gas station on Inman Street taken at 6:21 a.m. on September 22, 2019. The video captured Mr. Ledford's truck "with the box in the back" followed closely by Roberson's Grand Marquis "headed from High Street towards Fort Hill Cemetery." There was no television in the back of the truck at that point. Approximately 11 minutes later, the gas station video captured Roberson's vehicle traveling away from the cemetery toward the High Street and Scheeler Street area. Video surveillance footage from Flower's Bakery, which depicted South Ocoee Street across from the cemetery, captured Roberson's vehicle traveling through the cemetery. Video surveillance footage from a tire store at the corner of 3rd and South Ocoee captured Defendant's black Chrysler Sebring "going north on North Ocoee" away from the cemetery.

4

Video surveillance footage from a residence near McCann Road taken on September 22, 2019, captured a black car traveling on Scheeler Street at 7:52 a.m. Three minutes later, the same camera captured two individuals walking on Scheeler Street toward McCann Road. Ten minutes later, the same camera captured the same two individuals walking away from McCann Road.

Lt. Hinson testified that he interviewed Defendant on October 2, 2019, and that during the interview, he showed Defendant screen shots from video footage showing him and Roberson "walking towards the body" of Ms. Markcloud from Roberson's house. Defendant insisted that he often bought items from Mr. Ledford and that a lot of different people drove the black Sebring.

During cross-examination, the lieutenant acknowledged that Defendant's DNA was not discovered on any of the items sent to the Tennessee Bureau of Investigation for testing. He also acknowledged that Mr. Carter, who was loosely affiliated with the Bloods, was in possession of a 10 millimeter handgun and a small amount of heroin when officers searched the residence at 135 High Street that he shared with Defendant and Ms. McKissic. The lieutenant said that he had "heard" that Roberson was in a gang and that, in fact, "everybody" associated with the offenses "was part of a gang."

Forensic testing established the presence of gasoline on the sheet that had been wrapped around Mr. Ledford's body. Forensic DNA analysis established the presence of Roberson's DNA on the interior door handle, rear view mirror, and cracks in the driver's seat of Mr. Ledford's truck, and the presence of Mr. Ledford's DNA on the bullet removed from the back door and the swabs taken from the frame and threshold of the back door of 135 High Street. DNA from the outside of the wooden box belonged to a man named John Tyler Dodd, who was incarcerated at the time of the murders. Mr. Carter's DNA was discovered on the magazine of the 10 millimeter handgun collected from 135 High Street, but that gun was not identified as the weapon that fired the bullets that killed the victims.

Dr. Amy Hawes performed the autopsies of Mr. Ledford and Ms. Markcloud. Mr. Ledford's remains were sent to the medical examiner's office in the wooden box in which body was discovered. Mr. Ledford suffered a single gunshot wound to his torso, but Dr. Hawes was unable to differentiate between the entrance and exit wounds because of the level of decomposition. However, holes in the front of his shirt and jacket roughly corresponded to the wound on his front chest. Similarly, holes in the back of his shirt and jacket roughly corresponded to the wound on his right lower back. The bullet damaged Mr. Ledford's heart, liver, stomach, and spleen, and the cause of death was a gunshot wound to the torso. Mr. Ledford's blood tested positive for amphetamine, methamphetamine, and alcohol, but Dr. Hawes could not say with certainty whether the low concentration of alcohol was "because he was drinking alcohol or from decomposition" given that "decomposition in and of itself can produce low concentrations of alcohol."

Ms. Markcloud's body was in an advanced state of decomposition when it arrived at the medical examiner's office. Dr. Hawes established that she suffered three gunshot wounds: one that entered the front and exited the back of her skull, one that entered her left cheek and exited the right side of her neck, and one that caused a superficial injury to her right shoulder. The doctor stated that the shoulder wound could have been caused by the same shot that entered Ms. Markcloud's cheek and exited her neck. The gunshot to Ms. Markcloud's head "was exactly measured in the midline of the forehead." The cause of death was multiple gunshot wounds. Ms. Markcloud's blood also tested positive for alcohol, but, again, Dr. Hawes could not determine whether it was from drinking alcohol or from decomposition.

Both victims were killed with the same 40 caliber weapon. However, despite forensic testing of several firearms, including the one collected from 135 High Street, authorities were unable to identify the firearm that fired the shots that killed the victims.

Prior to September 20, 2019, Defendant told his girlfriend, Velma McKissic,[2] that Roberson's motorcycle had been stolen. Following her release from a mental health facility on Friday, September 20, 2019, Ms. McKissic, Mr. Carter, and other friends went to a bar near their residence called Tebow's, and later gathered with other friends, including Roberson, at her residence at 135 High Street. At some point in the early hours of Sunday morning, when "it was still dark or getting light outside," she "heard a loud noise that sounded like a TV being dropped." Later that morning, Defendant ask Ms. McKissic to get Mr. Carter to "help him move a large TV that was not there the night before." Ms. McKissic saw Roberson at her residence that morning. At some point that same morning, Defendant "came into their room, got money and told her he was getting cigarettes," and she heard his Chrysler Sebring leaving. She later identified Defendant and Roberson as the two men captured on surveillance video "walking down Sheeler Street" in the vicinity of Ms. Markcloud's body and "the car on Sheeler Street as [Defendant's] Sebring."

Based upon this evidence, the jury convicted Defendant of facilitation of the first degree murder of Mr. Ledford, facilitation of the second degree murder of Ms. Markcloud, evidence tampering, abuse of Mr. Ledford's corpse, and attempted abuse of Ms. Markcloud's corpse. The jury also convicted Defendant of conspiracy to commit first degree murder based on his agreement with Roberson "to proceed with the killing" of Mr. Ledford and Ms. Markcloud and his traveling with Roberson to the site where Ms. Markcloud's body was later discovered. Following a sentencing hearing, the trial court sentenced Defendant, a Career Offender, to an effective sentence of ninety years' incarceration to be served at sixty percent release eligibility by operation of law.

_____

[2] Ms. McKissic proved to be completely unreliable as a live witness. She was hostile to both the State and Defendant and refused to abide by admonishments to confine her testimony to admissible matters. As a result, the parties agreed to a stipulation regarding the relevant and admissible information she could provide regarding the offenses.

Defendant filed a timely but unsuccessful motion for new trial followed by this timely appeal.

## Analysis

On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions of facilitation of second degree murder, conspiracy to commit first degree murder, abuse of a corpse, and attempted abuse of a corpse, and asserts that the State committed plain error and deprived him of the right to a unanimous jury verdict on the charge of evidence tampering by failing to make an election.[3] We consider each claim in turn.

## I. Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient to support his conviction for facilitation of second degree murder because the State failed to establish that he knew that Roberson intended to kill Ms. Markcloud or that he furnished substantial assistance in her murder. He also contends that the evidence was insufficient to support his conviction for conspiracy to commit first degree murder because the overt acts found by the jury were legally insufficient to sustain the conviction. Regarding the convictions relating to the abuse of each corpse, Defendant argues that the State failed to establish that the disposal of each victim's corpse occurred in a manner known to be in violation of statutes prohibiting littering or trespass.

We review Defendant's challenges to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We will not revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by

---

[3] Defendant does not challenge his conviction of facilitation of first degree murder.

such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

### A. Facilitation of Second Degree Murder

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). To support a conviction for facilitating a felony, the State must "prove the commission of a specified felony and the assistance the [defendant] gave to the person committing the specified felony." *State v. Dych*, 227 S.W.3d 21, 40 (Tenn. Crim. App. 2006). "A defendant charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party." *Id.*

The evidence adduced at trial established that Defendant knew that Roberson was looking for Mr. Ledford, whom he believed had stolen his motorcycle, and that Roberson was angry. The group of individuals assembled by Roberson to look for Mr. Ledford encountered Ms. Markcloud, and she threatened to call the police on them. Mr. Ledford came to Defendant's residence during the early morning hours while Roberson was not there. Mr. Ledford's DNA was found inside Defendant's residence, including on a bullet removed from the back door, and a trail of his blood led from the kitchen toward the driveway. Mr. Ledford and Ms. Markcloud were together in Mr. Ledford's truck when Mr. Ledford left Ocoee Village Apartments, and Mr. Carter saw a passenger sitting in Mr. Ledford's truck in the driveway of 135 High Street. Ms. Markcloud was shot to death while sitting in the passenger seat of Mr. Ledford's truck, and the same unknown 40 caliber weapon was used to kill both victims. When Mr. Carter awoke in the morning after he had let Mr. Ledford into the residence, Mr. Ledford's truck was gone, and Defendant was cleaning what appeared to be blood in the kitchen. The presence of Roberson's DNA inside Mr. Ledford's truck suggested that it was he who drove Mr. Ledford's truck to Fort Hill Cemetery. Defendant told Mr. Carter that both he and Roberson had been involved in the deaths and described the location where Ms. Markcloud's body had been dumped. Surveillance video footage established that Defendant participated in the disposal of Ms. Markcloud's body.

In our view, a rational jury could have inferred that Defendant, aware that Roberson was angry with and intended to harm Mr. Ledford over the theft of his motorcycle, either alerted Roberson to Mr. Ledford's presence at Defendant's residence or allowed Roberson to enter the residence while Mr. Ledford was there. Further, a rational jury could have

inferred from the forensic proof that both victims were murdered at Defendant's residence, and Mr. Carter saw Defendant attempting to remove some of that proof. Defendant told Mr. Carter that Mr. Ledford was dead, that Ms. Markcloud was "f***ed up," that both he and Roberson were involved, and that the shootings were "like a movie." Additionally, the evidence showed that Defendant continued to ally himself with Roberson well after the murders as he was a direct participant in the disposal of Ms. Markcloud's body. Consequently, the evidence was sufficient to support Defendant's conviction of facilitation of second degree murder.

### B. Conspiracy

Defendant next contends that the overt acts found by the jury were legally insufficient to support his conspiracy conviction. The State asserts that the evidence was sufficient.

Code section 39-12-103 provides, in pertinent part, as follows:

(a)    The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

. . . .

(d)    No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

(e)(1)  Conspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it.

Tenn. Code. Ann. § 39-12-103(a), (d), (e)(1). "The statute, by its terms, extends the objectives of the offense of conspiracy to commit a substantive crime to include concealing the crime and obstructing justice relative to it." *State v. Henry*, No. 01C01-9505-CR-00161, 1999 WL 92939, at *19 (Tenn. Crim. App. Feb. 25, 1999), *aff'd*, 33 S.W.3d 797 (Tenn. 2000).

9

The essential feature of the offense of conspiracy is the "agreement to accomplish a criminal or unlawful act." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). To prove a conspiracy, however, the State is not required to show a formal agreement between the parties to commit the unlawful act, which, in this case, was first degree premeditated murder. *See id*; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). "[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement." *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); *see Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). The agreement "may be proven by circumstantial evidence." *Pike*, 978 S.W.2d at 915.

We agree with Defendant that the agreement to commit the murder could not have served as an overt act in furtherance of the conspiracy because that agreement is the essential feature of the offense. *See id.* However, it is our view that the remaining act found by the jury—that Defendant and Roberson visited the location where Ms. Markcloud's body was dumped—was an overt act in furtherance of the conspiracy. Contrary to Defendant's claim that this act was insufficient to support the conspiracy conviction, the plain language of the statute proscribing conspiracy includes "measures, other than silence, for concealing the crime or obstructing justice in relation to it" among the "objectives" of the conspiracy. Tenn. Code Ann. § 39-12-103(e)(1). Further, our supreme court has specifically concluded that that "the commission of the offense that was the goal of the conspiracy does not necessarily end the conspiracy." *State v. Henry*, 33 S.W.3d 797, 803 (Tenn. 2000). Here, the evidence established that Ms. Markcloud's body was discarded alongside McCann Road and that items were placed on top of her body to conceal it. A rational jury could have concluded that Defendant's visiting the location of the body with Roberson was among the measures taken to conceal the crimes.

## C. Abuse of a Corpse

Defendant also challenges the sufficiency of the evidence supporting his convictions of abuse of a corpse and attempted abuse of a corpse, claiming that the State failed to prove that Defendant acted in violation of the statutes that prohibit littering or trespass. The State contends that the evidence was sufficient.

As charged in this case, "[a] person commits an offense who, without legal privilege, knowingly . . . [d]isposes of a corpse in a manner known to be in violation of law." Tenn. Code Ann. § 39-17-312(a)(3). Although the indictment did not specify the law Defendant violated when disposing of the victims' bodies, the trial court charged the jury, without objection from Defendant, "For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt . . . that the defendant did dispose of a corpse in a manner known to be in violation of law; to-wit: littering and trespass[.][4] Defendant

---

[4] As noted by Defendant, the Code contains provisions regarding the proper disposal of human remains and criminalizing the violation those provisions. *See, e.g.*, Tenn. Code Ann. § 62-5-101 to -810.

10

contends that the State failed to show that the manner of the disposal of the bodies in this case violated either provision.

Although, as Defendant also correctly observes, most cases charging the abuse of a corpse travel under Code section 39-17-312(a)(1), which applies when a person "physically mistreats" a corpse "in a manner offensive to the sensibilities of an ordinary person," our review is limited to whether the evidence established that the disposal of the victims' bodies violated the statutes against littering or trespassing. In our view, the evidence presented was insufficient to establish the offenses of abuse of a corpse or attempted abuse of a corpse as charged in this case. *Cf. State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) ("Put simply, not only must the government prove the crime it charges, it must charge the crime it proves.").

Littering occurs when a person "[k]nowingly places, drops or throws litter on any public or private property without permission and does not immediately remove it." Tenn. Code Ann. § 39-14-502(a)(1). Litter is defined as "garbage, refuse, rubbish and all other waste material." *Id.* § 39-14-501(3). Garbage, refuse, and rubbish all have statutory definitions inapt to the human body, and the classification of littering offenses requires proof regarding the weight and volume of the litter. *See id.* § 39-14-501 to 505. We decline the State's invitation to discuss whether human remains are putrescible, *see id.* § 39-14-501(4) (defining refuse as "all putrescible and nonputrescible solid waste), because we are loathe to include the human body within any of these definitions, particularly given that our supreme court has observed that "[c]ivilized countries have always recognized and protected, as sacred, the right to" burial in keeping with one's preferences and "an undisturbed repose of the human body when buried." *Thompson v. State*, 58 S.W. 213, 213 (Tenn. 1900).

Criminal trespass occurs when a person "enters or remains on property, or any portion of property, without the consent of the owner." Tenn. Code Ann. § 39-14-405. "Consent may be inferred in the case of property that is used for commercial activity available to the general public . . . ." *Id.* Arguably, both the cemetery and the roadside where the victims' bodies were discovered were open to the public, and, consequently, would not fall within the ambit of the statute proscribing trespass. Certainly, nothing in the record indicated that the cemetery or roadside were posted with no trespassing signs, fenced off, or otherwise marked as closed to the public. Indeed, the State presented no proof from which the jury could have concluded that either of the victims' bodies were in an area not open to the public. However, "everybody's common sense would tell him that the real and substantial wrong was not the trespass on the land, but the indignity to the dead." *Larson v. Chase*, 50 N.W. 238, 240 (Minn. 1891) (cited with approval in *Thompson*, 58 S.W. at 213). Because the State failed to produce sufficient evidence to support either of Defendant's convictions related to the abuse of the victims' bodies as specifically charged in this case, we reverse those convictions and dismiss those charges. We note that the dismissal of these charges has no impact on the total effective sentence.

## II. Election of Offenses

Finally, Defendant contends that the trial court committed plain error by not requiring the State to elect the conduct upon which it relied to support the charge of evidence tampering. The State asserts that no error occurred.

As Defendant concedes, he did not ask the trial court to require an election and did not challenge the jury instructions, which did not contain an election. As a result, our review is confined to a determination whether the failure to elect resulted in plain error. Relief under the plain error doctrine is available when

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Linville*, 647 S.W.3d 344, 353-54 (Tenn. 2022) (quoting *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020)). "Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review." *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015) (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973)).

As to the first factor, the record clearly establishes that Defendant did not ask the trial court to require the State to elect the conduct upon which it intended to rely for the offense of evidence tampering and that he did not raise this issue in his motion for new trial. The State did not make an election, and the trial court provided no limitations in its instructions to the jury.

As to the second factor, we observe that "the election requirement applies to offenses, not to the facts supporting each element of the offense." *Knowles*, 470 S.W.3d at 424. As charged here, "[i]t is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." Tenn. Code Ann. § 39-16-503(a)(1). Defendant contends that the evidence established three discrete instances of evidence tampering, thus making election necessary. The State contends that evidence tampering is a continuing offense, rendering election unnecessary, and that, in any event, Defendant cannot establish the breach of a clear and unequivocal rule of law because neither this court nor our supreme court has required an election for a single charge of evidence tampering. We agree with the State's latter assertion.

This court considered this precise issue in *State v. James*, where James was charged with and convicted of a single count of evidence tampering, and the State presented evidence of more than one act that could have supported his conviction. *State v. James*, No. W2022-00023-CCA-R3-CD, 2023 WL 3749813,*10 (Tenn. Crim. App. June 1, 2023). Like Defendant, James did not ask for an election, did not challenge the jury instructions, and did not raise the issue in his motion for new trial. *Id.* Applying plain error review, we observed that "Tennessee courts have yet to address the question of whether tampering with evidence constitutes a continuing offense" and, accordingly, "decline[d] the State's invitation for us to do so here given the limited nature of our review and the parties' limited briefing on the issue." *Id.* at *12. Although the issue has been thoroughly briefed and argued by the parties, our review remains confined to plain error as it was in *James*. Perhaps more importantly, however, no Tennessee court has squarely addressed the issue whether evidence tampering is a continuing offense. As a result, the law in this area remains unsettled, and Defendant cannot establish that a clear and unequivocal rule of law was breached. *See State v. Pewitte*, ___ S.W.3d ___, No. W2024-01128-CCA-R3-CD, 2025 WL 3510902, at *5 (Tenn. Crim. App. Dec. 8, 2025), *per. app. denied* (May 21, 2026) (stating that proponent cannot establish the breach of a clear and unequivocal rule of law "when the law is unsettled or case law supports differing conclusions") (citations omitted)); *see also State v. Lowe*, No. E2025-00140-CCA-R3-CD, 2026 WL 810567, at *14 (Tenn. Crim. App. Mar. 24, 2026) (declining to consider issue of first impression under the plain error doctrine) (citations omitted), *perm. app. filed*. Our inquiry ends here because, as our supreme court has observed, if the proponent fails to establish any of the five criteria for plain error review, "we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Knowles*, 470 S.W.3d at 425 (citing *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010)).

## Conclusion

Because the evidence was insufficient to support Defendant's convictions of abuse of a corpse and attempted abuse of a corpse, we reverse those convictions and dismiss the charges. We affirm the judgments of the trial court in all other respects.

_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE

13